**UNITED STATES ex rel. Thomas JOHNSON, Petitioner-Appellee,**

**v.**

**CHAIRMAN OF NEW YORK STATE BOARD OF PAROLE and Commissioner of New York State Department of Correctional Services, Respondents-Appellants.**

**No. 617, Docket 73-2581.**

United States Court of Appeals, Second Circuit.

Argued Jan. 21, 1974.

Decided June 13, 1974.

Judgment Vacated Nov. 18, 1974. See 95 S.Ct. 488.

Burton Herman, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen., of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, of counsel), for respondents-appellants.

Stanley A. Bass, New York City (NAACP Legal Defense Fund, of counsel), for petitioner-appellee.

Before HAYS, MANSFIELD and OAKES, Circuit Judges.

MANSFIELD, Circuit Judge:

This appeal by the Chairman of the New York State Board of Parole and the Commissioner of the New York State Department of Correctional Services from an order of Judge John F. Dooling, Jr., of the Eastern District of New York, raises the issue of whether the Due Process Clause of the Fourteenth Amendment requires the New York State Board of Parole to provide inmates of state prison facilities with a written statement of reasons when release on parole is denied them. We hold that it does.

Appellee Thomas Johnson is presently imprisoned in the Auburn Correctional Facility, Auburn, New York, under a sentence of from 15 to 16 years imposed on him as a second felony offender on June 6, 1966, by the New York Supreme Court, Kings County, after a jury trial. In March, 1973, Johnson appeared before members of the New York State Board of Parole, who, on March 13, 1973, denied him parole and continued his imprisonment for another year without giving him any statement of reasons for their decision. In April, 1973, Johnson brought an Article 78 proceeding in the New York Supreme Court, Cayuga County, seeking an order compelling the Board of Parole to inform him of their reasons for denying him parole. This proceeding was dismissed by the court on May 4, 1973, on the grounds that under N.Y. Correction Law § 212[1] the Board's decision was not subject to review since Johnson had made no showing that the parole proceedings were not conducted according to law.

After his Article 78 proceeding was dismissed, a decision which he did not appeal, Johnson on June 26, 1973, commenced the present action in the district court by petitioning for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. However, since Johnson did not seek actual release from custody but merely a statement of reasons for the denial of his parole, the district court, construing Johnson's *pro se* petition liberally, Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), treated it as an application for injunctive relief under 42 U.S.C. § 1983 which was not subject to an exhaustion of state remedies requirement. See Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968); Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); Wilwording v. Swenson, 404 U. S. 519, 92 S.Ct. 407, 30 L.Ed.2d 418 (1972). Reaching the merits of the petition, the district court held that as a minimum safeguard against arbitrary action, the due process clause of the Fourteenth Amendment required the Parole Board to state the reasons for denying Johnson release on parole.

## DISCUSSION

Appellants do not seriously question the district court's treatment of the habeas petition as a suit for injunctive relief under 42 U.S.C. § 1983. They contend, however, that our decision in Menechino v. Oswald, 430 F.2d 403 (2d Cir. 1970), cert. denied, 400 U.S. 1023, 91 S. Ct. 588, 27 L.Ed.2d 635 (1971), which upheld dismissal of a prisoner's complaint challenging parole release proceedings on constitutional grounds, mandates dismissal of the petition in this case. We disagree.

The issue before us in *Menechino* was not merely whether the prisoner desiring parole was entitled to a statement of reasons, but whether he was entitled to a whole gamut of due process rights which he sought as a package, including

"(i) notice of charges, including a substantial summary of the evidence and reports before the Board, (ii) a fair hearing, including the right of counsel, to cross-examination and confrontation and to present favorable evidence and compel the attendance of

---

1. N.Y. Correction Law § 212 provides that "The action of the board of parole in releasing prisoners shall be deemed a judicial function and shall not be reviewable if done according to law."

favorable witnesses, and (iii) a specification of the grounds and underlying facts upon which the determination is based; . . . " 430 F.2d at 405.

From the outset the petitioner in *Menechino* made it clear that his principal interest was in obtaining the right to be represented by counsel and to cross-examine witnesses. His request for a specification of the grounds of the Parole Board's election was at all times subordinated to these primary demands. Indeed, the focus of the arguments, briefs and our opinion in *Menechino* was almost entirely upon his demand for the right to counsel, cross-examination and introduction of affirmative evidence. It was apparent that unless the full panoply of procedural due process rights sought by him were granted, Menechino was not interested merely in obtaining a statement of the Board's reasons. We therefore gave no consideration to partial relief.

In denying Menechino the full-scale formal trial-type due process rights demanded by him we based our decision mainly on the ground that a parole release, as distinct from a parole revocation, determination is not an adversarial proceeding in which "charges" are preferred and disputed issues of fact presented, which might require that the weapons of legal counsel, cross-examination and other procedural protections be made available to the prisoner. We noted that, on the contrary, in parole release proceedings, the Board may have an identity of interest with the inmate, at least to the extent of granting release where it will aid in the prisoner's rehabilitation and adjustment to society without presenting an undue risk of further anti-social activity. The significance of the distinction between parole release and parole revocation proceedings was later noted by us in United

States ex rel. Bey v. Connecticut, 443 F 2d 1079, 1086 (2d Cir.), vacated as moot, 404 U.S. 879, 92 S.Ct. 196, 30 I, Ed.2d 159 (1971).

A second ground for our decision in *Menechino* was that since New York had granted almost absolute power to the Board to deny parole and the prisoner did not presently enjoy any liberty, he lacked a sufficient "interest" to entitle him to procedural due process in a parole release proceeding. We view this second ground as having been superseded by the Supreme Court's rejection of similar reasoning in its more recent decision in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), holding that in parole revocation proceedings the Board must, as a matter of minimum due process, provide the parolee with a hearing. It is true that in *Menechino* we indicated (430 F. 2d at 409) that we might reach the same conclusion in a parole *revocation* proceeding where the "parolee, having been released, enjoys a liberty akin to a private interest [of which] . . . the Board is seeking to deprive him . . . because of his alleged violation of one or more of the conditions of his parole," and that the issues raised by specific charges against a parolee might lend themselves to "a trial-type hearing, including the right to legal counsel with traditional skills suited to such a controversy," 430 F.2d at 409. However, we also noted that as of that date all other courts of appeal faced with the issue—some seven in number—had held that a parolee was not entitled to such due process protection in parole revocation proceedings. In our view *Morrissey* not only cast grave doubt upon these decisions but, more important for present purposes, rejected the concept that due process might be denied in parole proceedings on the ground that parole was a "privilege" rather than a "right." [2]

2. We recognize that in *Morrissey* the Supreme Court referred in a footnote to our language in United States ex rel. Bey v. Connecticut, 443 F.2d 1079, 1086 (2d Cir. 1971), that "It is not sophistic to attach greater importance to a person's justifiable reliance on maintaining his conditional freedom so long as he abides by the conditions of his release, than to his mere anticipation or hope of freedom." See 408 U.S. at 482

See Graham v. Richardson, 403 U.S. 365, 374, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). Parole was thenceforth to be treated as a "conditional liberty," representing an "interest" entitled to due process protection. A prisoner's interest in prospective parole, or "conditional entitlement," must be treated in like fashion. To hold otherwise would be to create a distinction too gossamer-thin to stand close analysis. Whether the immediate issue be release or revocation, the stakes are the same: conditional freedom versus incarceration.

Our view is strengthened by the fact that most inmates in New York can expect parole. Fifty-four percent of all prisoners released from prison in 1970, according to 46 reporting jurisdictions, left as parolees. Kastenheimer and Eglit, Parole Release Decision-Making: Rehabilitation, Expertise and the Demise of Mythology, 22 Amer.U.L.Rev. 477, 481 (1973). In New York the figure is even higher. In 1972, for instance, the New York State Parole Board released 4,412 inmates on parole, or 75.4% of the cases coming before it. See "Report on New York Parole" by Citizens' Inquiry on Parole and Criminal Justice, Inc. (1974), 48. Thus, the average prisoner, having a better than 50% chance of being granted parole before the expiration of his maximum sentence, has a substantial "interest" in the outcome. For him, with such a large stake, the Board's determination represents one of the most critical decisions that can affect his life and liberty.

Accordingly we conclude, in light of *Morrissey*, that some degree of due process attaches to parole release proceedings. This conclusion does not overrule *Menechino*, which held that an inmate being considered for parole was not entitled to the full panoply of due process

rights, including a specification of charges, counsel, and cross-examination, in a non-adversarial determination. A determination that an inmate being considered for release on parole is entitled to one due process weapon (e. g., a statement of reasons) would not necessarily entitle him to the full panoply. See Drown v. Portsmouth School District, 435 F.2d 1182 (1st Cir.), cert. denied, 402 U.S. 972, 91 S.Ct. 1659, 29 L.Ed.2d 137 (1970). As we find below, the considerations governing whether a statement of reasons should be provided have little to do with whether providing counsel to prisoners in all parole release proceedings would be desirable, much less required by due process. Cf. Gagnon v. Scarpelli, 411 U.S. 778, 787–788, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1972). See also Jacob and Sharma, Justice After Trial: Prisoners Need for Legal Services in the Criminal Correctional Process, 18 Kansas L.Rev. 493 (1970).

In resolving the question of whether a statement of reasons for denial of parole is within the process that is due an inmate, we start from the generally accepted premise that due process is a flexible concept which may vary in different contexts, depending upon a complexity of factors, including "[t]he nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding," Hannah v. Larche, 363 U.S. 420 at 442, 80 S.Ct. 1502, 1515, 4 L.Ed.2d 1307 (1960), see Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). "The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss,' Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct.

n. 8, 92 S.Ct. 2593, 33 L.Ed.2d 484. But this hardly indicates that due process is to be · applied to parole revocation merely because the conditional freedom was presently being enjoyed, which would be nothing more than a reincarnation of the right-privilege dichotomy in a not-too-deceptive disguise.

See Comment, The Parole System, 120 U. Pa.L.Rev. 282, 363 (1971). The Court was simply reinforcing its point that conditional liberty permits much greater freedom of action by the parolee than does confinement in prison.

624, 647, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication." Goldberg v. Kelly, 397 U.S. 254 at 262, 90 S.Ct. 1011 at 1017, 25 L.Ed.2d 287 (1970). See Escalera v. New York City Housing Authority, 425 F.2d 853, 861 (2d Cir.), cert. denied, 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970).

Turning first to the nature of the parole release proceeding and the risk of harm to the inmate under consideration for parole, his interest is enormous. For him the Board's decision represents the difference between incarceration and conditional liberty. It is equally clear that the Board is an extraordinarily powerful administrative body, possessing vast discretionary authority. It not only decides whether and when a prisoner will be released on parole; it also decides in most cases when he will become eligible for parole and, if parole is granted, the conditions of that parole. In making these crucial decisions it is guided by statutory standards that are extremely vague. The controlling statute, N.Y. Corrections Law, § 213 (McKinney's Supplement 1973) provides:

> "Discretionary release on parole shall not be granted merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the board of parole is of opinion that there is reasonable probability that, if such prisoner is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society."

In view of the almost boundless authority thus vested in the Board and the nebulousness of the statutory standards governing release, one might question whether a statement of reasons, the primary function of which is to facilitate judicial review, see SEC v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943), could serve any purpose at all. Assuming that the Board, vested as it is with apparently unfettered discretion, has special competence to make the type of predictions called for by N.Y. Correction Law § 213—and its expertise in this area has been questioned [3]—is a reviewing court able to determine whether there has been an "abuse of discretion," see United Steelworkers of America, AFL–CIO v. NLRB, 126 U.S.App.D.C. 215, 376 F.2d 770, cert. denied sub nom., Northwest Engineering Co. v. NLRB, 389 U.S. 932, 88 S.Ct. 297, 19 L.Ed.2d 285 (1967); Indianapolis Glove Co. v. NLRB, 400 F.2d 363 (6th Cir. 1968), without merely substituting the judge's will for the board's discretion? Clearly review for "abuse of discretion" is more difficult where the statute's language does not provide a workable decision-making scheme, and the broad grant of discretion has not been structured for exercise in a fair, rational and non-discriminatory fashion. The normal, indeed logical, method used to achieve this objective is for the administrative body which is vested with such broad powers to formulate and publish rules and criteria that will provide more precise guidelines for the responsible exercise of its discretion. See Friendly, The Federal Administrative Agencies: The Need for Better Definition of Standards, 75 Harv.L.Rev. 863, 1055, 1263 (1962); Davis, A New Approach to Delegation, 36 U.Chi.L.Rev. 713 (1969). But whether or not such rules are established, a statement of reasons will permit the reviewing court to determine whether the Board has adopted and followed criteria that are appropriate, rational and consistent, and also protects the inmate against arbitrary and capricious decisions or actions based upon impermissible considerations.

The broad powers vested by statute in the Board do not relieve it from

---

3. See Kastenheimer and Eglit, Parole Release Decision-Making: Rehabilitation, Expertise and the Demise of Mythology, 22 Amer.U.L.Rev. 477, 503–10 (1973); Goldfarb and Singer, After Conviction 278–82 (1973).

the duty of observing meaningful criteria for determining in each case when a prisoner's release "is not incompatible with the welfare of society." The very scope of this sweeping term demands that relevant factors and limits be established and observed by the Board in deciding whether to grant or deny parole. In making the ultimate decisions demanded of it the Board must presumably consider and give appropriate weight in each case to a variety of factors, including the prisoner's attitude toward law and the community, his mental and physical state, his emotional stability, his sense of responsibility, parole plans, family status, skills, prospective employment, prospective residence, use of narcotics, prior criminal record, and his conduct in prison. See Dawson, The Decision to Grant or Deny Parole: A Study of Parole Criteria in Law and Practice, 1966 Wash.U.L.Rev. 243, 248–95; A.L.I., Model Penal Code § 305.13 (Tent. Draft No. 5, 1956). However, unless and until the Board (1) discloses the release criteria observed by it and the factors considered by it in determining whether these criteria are met, and (2) states the grounds for denial of parole in each case where it is denied, the prisoner, the community and a reviewing court are left in the dark as to whether it applied permissible criteria, considered relevant factors and act-

ed rationally rather than pursuant to whim and caprice in any given case.[4]

We do not question the Board's right, within constitutional limits, "to make policy, establish procedures, and to decide particular cases with a minimum of interference." See Comment, Curbing Abuse in the Decision to Grant or Deny Parole, 8 Harv. Civil Rights—Civil Liberties L.Rev. 419, 438 (1973). Nor do we suggest that the courts should serve as "super-Parole Boards." But judicial review should be available where the Board has arrogated to itself decisions properly made only by the legislature, when the Board's decision in a case is inconsistent with statutory directives, when improper criteria are used, or when its decision has no basis in the prisoner's file. We recognize that parole decision-making should involve difficult and sensitive diagnosis and prognosis in many cases, based on application and weighing of numerous factors of varying relevance. Indeed the legislature may have demanded more of the Board than it can reasonably be expected to provide. But under the present system of not giving any reasons at all, the Board may be making "major policy decisions properly made by [the legislature]," see American Ship Building Co. v. NLRB, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1964) ("The deference owed to an expert tribunal

4. The Board, while apparently observing certain release criteria in practice, has not reduced them to written form. See Report on New York Parole by Citizens Inquiry on Parole and Criminal Justice, Inc. (1973), 92–117. In practice the Board, before making its decision on parole release in each case, has available to it a detailed "case file" prepared under the supervision of the institutional parole officer who over a period of time conducts several interviews of each inmate, including one shortly prior to his being considered for parole, which are the subject of a report by him placed in the file. A "Parole Summary" is also prepared by him in anticipation of the Board's interview of the prisoner, which outlines in detail the inmate's legal history (including details of the offense for which he is incarcerated, his criminal record, outstanding warrants), his

institutional adjustment (including work record, vocational and academic education, medical and psychiatric diagnosis, disciplinary report) and the institutional parole officer's detailed evaluation of the case, with information as to the inmate's community parole plan, parole supervision needs, prospective housing and employment. A three-member panel of the Board conducts an extremely brief interview of the prisoner.

The information thus obtained is presumably for the purpose of determining (1) whether there is a substantial risk that the inmate, if released, will not conform to the conditions of parole or will return to crime, and (2) whether continued incarceration, correctional treatment, medical care or vocational training will improve his capability of leading a law-abiding life upon release.

cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress."). For example, the Board could conceivably be following such questionable policies as (1) denying parole in cases where prisoners had refused to cooperate with law enforcement authorities by acting as informers, (2) denying parole in so-called "sensitive" cases where, despite the Board's finding that the prisoner was sufficiently rehabilitated not to present a serious risk to the public, release would stir up unfavorable publicity, (3) denying parole where release would be frowned on by prison authorities because of the prisoner's poor discipline record, see Report on New York Parole by Citizens Inquiry on Parole and Criminal Justice, Inc. 97–119; Kastenmeier and Eglit, Parole Release Decision-Making, *supra,* at 517–19; Dressler, Practice and Theory of Probation and Parole 111–12 (1959),[5] or (4) denying parole where, because of the type of offense for which he had been committed, the prisoner has not yet served an "appropriate period" of incarceration that satisfies unarticulated and possibly inconsistent views of Board members regarding community retribution, incapacitation, or general deterrence, despite the prisoner's readiness for the community and lack of need for further institutional control, see New York State Special Commission on Attica, Official Report 97 (Bantam Books 1972). Without interfering with the Board's ability to exercise its discretion in future cases, it is our duty to determine whether the criteria used by the Board are consistent with the legislative purpose as expressed in the statute, see Dawson, The Decision to Grant or Deny Parole: A Study of Parole Criteria in Law and Practice,

1966 Wash.Univ. Law Quarterly 243, 300, and whether they are followed in practice.

A requirement that the Board state its reasons in each case for denial of parole would also serve purposes other than facilitating judicial review, which are peculiarly appropriate for parole release determinations. A reasons requirement "promotes thought by the decider," and compels him "to cover the relevant points" and "eschew irrelevancies." See Frankel, Criminal Sentences 40–41 (1973). The appropriateness of this observation becomes apparent when one considers the manner in which the Board presently functions. The New York Parole Board is now composed of not more than 12 members, with one member serving as chairman, N.Y. Correction Law § 6 (McKinney Supp. 1973). It functions through three-member panels, with a unanimous vote of all three members being required for a grant of parole, *id.* § 214(5). The statute provides for review by the entire Board but no procedures appear to have been established for such review. The fate of the inmate, therefore, may depend upon whether one member of the panel dissents.

That members of the panel probably do not fully consider all relevant factors and circumstances in each case before voting to grant or deny parole is suggested by the Official Report of the Attica Commission, which observes that the average time taken by panels in reading an inmate's file, interviewing him and then making a decision is 5.9 minutes. The Report states:

> "The parole folder may have as many as 150 pages of reports on the inmate which he has never seen. Two of the Commissioners often read the files of the inmates next in line while

---

5. The premise that prisons can serve as rehabilitative institutions has been seriously attacked and mounting evidence to the contrary indicates a lack of correlation between the inmate's institutional behavior and his fitness for release, see Kastenheimer and Eglit, Parole Release Decision-Making, *supra*

at 495–501, with the result that the concept of institutional rehabilitation has been labelled one of the great "myths" of twentieth-century penology; Kaufman, Prison: The Judge's Dilemma, Fordham Univ. School of Law (1973), 168 N.Y.L.J. 4.

an inmate is questioned by a third Commissioner. . . . The questions are often superficial: 'Do you feel you have the capabilities of functioning on the outside as a cook?' If the questions delve more deeply, they often concentrate on the inmate's past crime, rather than on this present condition or plans for the future. No one who worked with the inmate in prison is heard by the board.

"The panel reaches a decision immediately after the conclusion of the hearing. The two Commissioners who have been reading other inmates' files generally acquiesce in the recommendation of the Commissioner who has read the file and questioned the inmate under consideration. The legal requirement that all three Commissioners participate in the decision is satisfied only in the most perfunctory way." Attica Commission Report, *supra* at 96–97.

See also Dressler, Practice and Theory of Probation and Parole 117. The Attica Commission's observations are confirmed by others. A recent report by the Citizens Inquiry on Parole and Criminal Justice discloses that each prisoner's file, often voluminous, is examined by only one panel member, usually while participating with the other two members in the interview of another prisoner which is currently being conducted by the member who has examined that inmate's file. Although copies of the "Parole Summary" with respect to each interviewee are distributed to all three members, the necessity of conducting 40 to 50 interviews in seven or eight hours, coupled with each member's ex-

amination of the case files for which he is responsible, make it unlikely that all three members can become familiar with all of the relevant circumstances in each case before making the decision. Nor is there time for later study of the files. The usual procedure is for the panel in each case, *absente reo*, to decide the issue within a few minutes after the interview and, if parole is denied, to fix a date within two years for the prisoner's next interview. A denial is communicated to the inmate, after the panel's departure from the institution, on a form which gives no reasons and offers no suggestions as to how the prisoner might improve his chances of being released after the next interview. See Report on New York Parole by Citizens Inquiry on Parole and Criminal Justice, Inc. 78–90.

Besides safeguarding against purely arbitrary denials of parole, a reasons requirement can serve the important function of promoting rehabilitation by relieving inmates' frustrations and letting them know how they might, by improving their prison behavior or taking steps with respect to some other factor in doubt (e. g., prospective employment or housing), better their chances for release. To the inmate the Parole Board's decisions are a form of *arcana imperii*. His liberty appears to depend entirely on the whim, hunch or caprice of panel members. He is left to speculate as to why he was denied parole. Due to the apparent inconsistencies in Parole Board decisions, "[c]orruption and chance are among the favorite inmate speculations." See New York State Special Commission on Attica: Official Report, *supra* at 97.[6]

---

6. "While the board acts favorably in most cases, it engenders hostility because of the inconsistency of its rationale. Some inmates who have had good behavior records in prison are 'hit' (denied parole), while others with many infractions are granted parole. Some inmates with a long record of prior offenses may receive parole, while others, including first offenders, may be denied it. Nobody gives the inmate an explanation for these obviously inconsistent decisions or describes in anything more

than meaningless generalities the criteria used by the board in arriving at its decisions. Institutional parole officers give inmates pointers on what might subsequently impress the board, such as enrolling in Bible classes. But inmates who follow this advice carefully often find they are hit nevertheless. As a result, inmates are left to speculate among themselves as to the reasons for the board's decisions. Corruption and chance are among the favorite inmate speculations."

Besides breeding needless frustration, hatred, cynicism and disrespect for government institutions, the Board's failure to give reasons often induces feelings of hopelessness or despondency which lead inmates no longer to care about making any effort to improve themselves. Indeed, prison disturbances have been attributed to grievances based on unexplained denials of parole. Kastenmeier and Eglit, Parole Release Decision-Making, *supra* 484, 490. These feelings of despondency are well expressed in a letter written by an experienced advocate of prisoners' rights to the Chairman of the New Jersey State Parole Board:

"You will understand the hopelessness that a prisoner feels when he is told simply that parole is denied, without being told why. He wonders whether some facts might be brought to the Board's attention that would make a difference, but he cannot know what facts these might be. He wonders whether there may be some damaging information in the Board's files that is legitimately subject to question or refutation; but he cannot know whether this is so. He wonders whether there is some way in which his prison behavior should be changed, so as favorably to impress the Board; but he does not know in what way. He wonders, in short, whether there is anything he can do or say that will make the Board take a different view of his case; but he cannot know or learn the answer." Letter from Professor Anthony Amsterdam to Harold J. Ashby (Chairman, New Jersey Parole Board), Brief for Appellant at 5a, Monks v. New Jersey State Parole Board, 58 N.J. 238, 277 A.2d 193 (1971).

See also Davis, Discretionary Justice 132 (1969) ("One can imagine nothing more cruel, inhuman, and frustrating than serving a prison term without knowledge of what will be measured and the rules determining whether one is ready for release."). The probability of release on parole having been held out to most prisoners and the possibility of release to the balance, fundamental fairness would seem to dictate that rather than subject a prisoner who is denied parole to the inhumanity of ignorance the state should as a matter of minimum due process provide him with the reasons.

Other useful purposes might also be served by a reasons requirement. Hopefully a body of rules, principles and precedent would be established, which would promote consistency by the Board, see Davis, Discretionary Justice 106–07 (1969), and provide a basis for critical reappraisal by trained experts working either for the Parole Board or for private groups interested in the parole system. The courts would be educated concerning the probability of parole in particular cases, an education sorely needed, since judges who exercise their power to set minimum sentences, see N.Y. Penal Law § 70.00(3), are expected to play an important role in the parole process. See Comment, Curbing Abuse in the Decision to Grant or Deny Parole, *supra* at 440–41 ("Effective judicial administration of criminal justice demands that courts be aware of the manner in which parole boards make the decision to grant or deny parole.").

Undoubtedly a reasons requirement would impose some additional burden on the Parole Board and its members, which would depend upon the length and detail of each statement. However, assuming that parole is granted in the majority of cases handled by each panel, statements would be required only for the minority. Furthermore, appellants have made no attempt on this appeal to show that a reasons requirement would impose any significant burden on the state. We note in this connection that the federal Parole Board, see Wall Street Journal, Jan. 14, 1972 at 1, col. 1, and the parole boards in several other states have already—voluntarily—adopted the policy of providing inmates with a written statement as to why they were denied release on parole. See Washington Post, Aug. 23, 1973, at B1, col. 1 (Virginia State Board of Probation and

Parole decides to give a written statement of reasons for denial of parole); Monks v. New Jersey State Parole Board, 58 N.J. 238, 277 A.2d 193 (1971) (court advised that Parole Board of Pennsylvania has been furnishing written reasons to prisoners on denial of parole for 15 years). Alvin J. Bronstein, Executive Director of the National Prison Project of the American Civil Liberties Union Foundation, Inc., has submitted an affidavit reporting, on the basis of a written survey conducted in 1972 of state parole board practices, that, at the time of the survey, 34 states gave reasons to inmates either in writting or orally upon the denial of parole. See also O'Leary and Nuffield, Parole Decision-Making Characteristics: Report of a National Survey, 8 Crim.L.Bull. 651, 658 (1973) (parole boards in 33 jurisdictions either record reasons for their decision or inform the inmate directly of the decision).

■ To satisfy minimum due process requirements a statement of reasons should be sufficient to enable a reviewing body to determine whether parole has been denied for an impermissible reason or for no reason at all. For this essential purpose, detailed findings of fact are not required, provided the Board's decision is based upon consideration of all relevant factors and it furnishes to the inmate both the grounds for the decision (e. g., that in its view the prisoner would, if released, probably engage in criminal activity) and the essential facts upon which the Board's inferences are based (e. g., the prisoner's

long record, prior experience on parole, lack of a parole plan, lack of employment skills or of prospective employment and housing, and his drug addiction). See Beckworth v. New Jersey State Board of Parole, 62 N.J. 348, 301 A.2d 727 (1973). Thus a reasons requirement need not lead inevitably to "the full trappings of adversary trial-type hearings which would in all likelihood so burden and delay the entire parole release process as to disadvantage the very interests of the inmates as well as the public interest." Beckworth v. New Jersey State Board of Parole, 62 N.J. 348, 301 A.2d at 727. Cf. Medical Committee for Human Rights v. SEC, 139 U.S. App.D.C. 226, 432 F.2d 659, 668 (1970), vacated as moot, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972) (judicial review of an agency decision does not require agency to hold a formal evidentiary hearing). Nor are we persuaded that guidelines in this area will be so difficult to formulate that a reasons requirement will lead inevitably to endless litigation concerning the sufficiency of the written statement provided by the Parole Board. Cf. 5 U.S.C. § 555(e); City of San Antonio v. Civil Aeronautics Board, 126 U.S.App.D.C. 112, 374 F.2d 326, 331 (1967).

In light of the foregoing we conclude, in accord with the district court, that due process does require the New York State Parole Board to furnish state prisoners a written statement of reasons when release on parole is denied. See King v. United States, 492 F.2d 1337 (7th Cir. 1974); [7] United States ex rel.

7. In requiring the federal Parole Board to provide reasons when denying release on parole, the Seventh Circuit relied on the Administrative Procedure Act, which obligates federal administrative agencies to give "[p]rompt notice . . . of the denial . . . of a written application . . . accompanied by a brief statement of the grounds for denial," 5 U.S.C. § 555(e) (1970), rather than on due process. However, contrary to the position of the Fifth Circuit in Scarpa v. United States Board of Parole, 477 F.2d 278 (5th Cir.) (en banc), vacated as moot, 414 U.S. 809, 94 S.Ct. 79, 38 L.Ed.2d 44 (1973), which the dissent re-

lies on, the court also recognized that "a substantial argument can be made that some modicum of due process should attend the denial of the expectation of conditional freedom on parole inasmuch as its termination after having been granted inflicts a 'grievous loss' of a 'valuable liberty,' Morrissey v. Brewer, 308 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). . . . " Of further interest to us is the court's notation that the Administrative Conference of the United States had on June 9, 1972, adopted a resolution recommending that the federal Parole Board (1) should "in all instances" give a statement of reasons to prisoners who are

Harrison v. Pace, 357 F.Supp. 354 (E.D.Pa.1973); Johnson v. Heggie, 362 F.Supp. 851 (D.Colo.1973); Childs v. United States Board of Parole, 371 F.Supp. 1246, 14 Crim.L.Rptr. 2135 (D.D.C.1973); Starks v. Sigler (E.D.Mich. Dec. 11, 1973); Monks v. New Jersey State Board of Parole, 58 N.J. 238, 277 A.2d 193 (1971); In re Sturm, 11 Cal. 3d 258, 113 Cal.Rptr. 361, 52 P.2d 97 (filed April 18, 1974) (en banc).[8] See also President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections 86 (1967).

The judgment and order of the district court are affirmed.

HAYS, Circuit Judge (dissenting):

I dissent.

Analysis of this case begins, and could very well end, with the excellent opinion of Judge Mansfield in Menechino v. Oswald, 430 F.2d 403 (2d Cir. 1970), cert. denied, 400 U.S. 1023 (1971). In *Menechino* plaintiff sought a variety of due process rights in parole hearings, including "specification of the grounds and underlying facts upon which the determination is based." Id. at 404, 405. The district court granted summary

judgment for the state, 311 F.Supp. 319 (S.D.N.Y.1970), and we affirmed without qualification. The majority now claims that the court in *Menechino* "gave no consideration to partial relief." I find no basis for this conclusion.

The opinion in *Menechino* does not suggest that the court had failed to consider any part of the relief requested. The opinion says only that a statement of reasons is requested and that the denial of such a statement is affirmed. If petitioner was entitled to part of what he requested[1] the court should have granted him that part. Fed.R.Civ.P. 54(c). Nothing in the logic of the opinion in *Menechino* supports a distinction between a statement of reasons and the other procedural rights which the majority concedes were denied there. The court based its decision on a determination that a parole hearing is not an adversary proceeding and does not "necessarily" resolve disputed issues of fact, id. at 407–408; that the plaintiff did not "presently enjoy" an interest of the type protected by procedural due process, id. at 408; that imposition of due process requirements, "including . . . preparation of written decisions" would "enormously" increase the

---

denied parole, (2) should "develop a body of fully reasoned decisions—whether granting, denying or deferring parole—in typical or recurrent fact situations" in order to "serve as time-saving precedents and as the raw material for the subsequent formulation of standards" and (3) should open its decisions to public inspection. These recommendations provide additional support for our conclusion that minimum due process mandates a reasons requirement.

8. Both Third Circuit decisions relied on by Judge Hays in his dissent, Mosley v. Ashby, 459 F.2d 477 (3d Cir. 1972), and Madden v. New Jersey State Board of Parole, 438 F.2d 1189 (3d Cir. 1971), were decided before the Supreme Court's decision in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), was announced. As we observed in note 7 *supra*, the Fifth Circuit decision relied on by the dissent, Scarpa v. United States Board of Parole, 477 F.2d 278 (5th Cir.) (en banc), vacated as moot, 414 U.S. 809, 94 S.Ct. 79, 38 L.Ed.2d 44 (1973), was questioned by the Seventh Circuit in

King v. United States, 492 F.2d 1337 (7th Cir. 1974), which apparently did not consider the "reasons" issued settled by its earlier opinion in Farries v. United States Board of Parole, 484 F.2d 948 (7th Cir. 1973), relied upon by the dissent.

As the case citations in the text show, if we limited ourselves to the period since Morrissey v. Brewer, the assertion in note 4 of the dissent that "the majority of reported cases in the district courts and the state courts dealing with the issue have also denied inmates a statement of reasons" could *not stand*.

1. That *Menechino* continued to press demands for a statement of reasons is clear from a reading of his brief in this court, which includes quotations from passages in Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), and President's Commission on Law Enforcement and Administration of Justice, Task Force Report on Corrections 88 (1967), emphasizing the importance of a statement of reasons.

administrative burdens on the board, id. at 410; that judicial supervision of parole would involve the federal judiciary in "non-legal, non-judicial determinations for which it is not equipped by training or experience," id. at 412; and that recognition of limited due process rights would "no doubt . . . be followed by demands . . . for the full panoply of procedural rights," id. The opinion in *Menechino* provides no basis for the position that its reasoning, which logically applies to all the relief requested by plaintiff there, was not intended to apply to requests for statements of reasons.

Other courts have construed *Menechino* to refuse a statement of reasons. In Lewis v. Rockefeller, 305 F.Supp. 258 (S.D.N.Y.1969), aff'd, 431 F.2d 368 (2d Cir. 1970), plaintiff claimed that New York's parole board violated his constitutional rights by, inter alia, "failing to support final decisions with specific findings of fact." 305 F.Supp. at 259. In an opinion by Judge Feinberg (who dissented in *Menechino*) the court found it necessary only to cite *Menechino* as the ground for finding plaintiff's constitutional claim frivolous and for affirming the lower court's refusal to convene a three-judge district court. 431 F.2d at 371. See also Farries v. United States Board of Parole, 484 F.2d 948, 949 (7th Cir. 1973), which likewise interpreted *Menechino* to deny a statement of reasons.

The majority believes that since *Menechino* the applicable law has been changed by virtue of the holding of Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), that a parolee is entitled to certain due process rights before revocation of his pa-

role. The majority holds that *Morrissey*, by rejecting the view that parole is a privilege rather than a right, superseded the determination in *Menechino* that a prisoner lacks an "interest" of the type which entitles him to procedural due process. I cannot agree.

*Morrissey* dealt with the due process rights of one already paroled. To insure that the holding of the case would not be extended to those still incarcerated the Court quoted the following from the decision of this court in United States ex rel. Bey v. Connecticut State Board of Parole, 443 F.2d 1079, 1086 (2d Cir.), vacated as moot, 404 U.S. 879, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1971):

"It is not sophistic to attach greater importance to a person's justifiable reliance in maintaining his conditional freedom so long as he abides by the conditions of his release, than to his mere anticipation or hope of freedom." 408 U.S. at 482 n. 8, 92 S.Ct. at 2601.

The court in *Menechino* noted the basic difference between the two types of applications even before the decision in *Morrissey*:

"[T]he determination to be made differs from revocation of parole, where plausible reasons might be advanced in favor of minimum procedural due process." 430 F.2d at 409.

*Menechino* justified this distinction on the ground that "[t]he type of interest protected by procedural due process . . . is usually one presently enjoyed." Id. at 408.[2]

Not only has this circuit in *Menechino* and Lewis v. Rockefeller, supra, but the two other circuits which have addressed the question have decided that due process does not entitle a prisoner to a state-

---

**2.** See also Scarpa v. United States Board of Parole, 477 F.2d 278, 282 and n. 17 (5th Cir. 1973) (en banc), vacated as moot, 414 U.S. 809, 94 S.Ct. 79, 38 L.Ed.2d 44 (1974); Walker v. Oswald, 449 F.2d 481 (2d Cir. 1971).

In Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), decided the same day as *Morrissey*, the Supreme Court declared that a non-tenured teacher at

a state college was not entitled to a statement of reasons upon failure of the state to renew his one-year contract. The Court held that such a non-tenured teacher lacks a liberty or property interest protected by due process. With respect to the former the Court held that mere refusal to renew a contract did not deny liberty. Id. at 572–575, 92 S.Ct. 2701–2708.

ment of reasons for denial of parole.[3] See Scarpa v. United States Board of Parole, 477 F.2d 278 (5th Cir. 1973) (en banc), vacated as moot, 414 U.S. 809, 94 S.Ct. 79, 38 L.Ed.2d 44 (1974); Mosley v. Ashby, 459 F.2d 477 (3d Cir. 1972); Madden v. New Jersey State Board of Parole, 438 F.2d 1189 (3d Cir. 1971). Cf. Farries v. United States Board of Parole, supra.[4]

I would reverse the determination of the district court and dismiss the complaint.

3. The only federal Court of Appeals case cited by the majority, King v. United States, 492 F.2d 1337 (7th Cir. 1974), expressly relied on the Administrative Procedure Act rather than due process. The majority recognizes this, n. 7, ante.

4. Moreover, the majority of reported cases in the district courts and the state courts dealing with the issue have also denied inmates a statement of reasons. See Battle v. Norton, 365 F.Supp. 925, 928 (D.Conn.1973); Barradale v. United States Board of Parole, 362 F.Supp. 338, 340 (M.D.Pa.1973); Bradford v. Weinstein, 357 F.Supp. 1127, 1131 (E.D.N.C.1973); Williams v. United States, 327 F.Supp. 986, 987 (S.D.N.Y.1971); Witt v. Arizona ex rel. Eyman, 18 Ariz.App. 120, 500 P.2d 905 (1972).