### David K. DUMSCHAT

v.

### BOARD OF PARDONS, STATE OF CONNECTICUT et al.

#### Civ. No. H-76-102.

United States District Court, D. Connecticut.

June 16, 1977.

---

7. *Johnson v. Anderson, supra*, 370 F.Supp. at 1391.

Judith M. Mears, Stephen Wizner, Dennis E. Curtis, and Mary F. Keller, and John R. Regier and Jack Hanley, Law Student Interns, New Haven, Conn., for plaintiff.

Stephen J. O'Neill, Asst. Atty. Gen., Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

Plaintiff David K. Dumschat is currently confined at the Connecticut Correctional Institution, Enfield, where he is serving a sentence of life imprisonment as a result of his 1964 plea of guilty and conviction of the crime of murder in the second degree. Under his present life sentence, Dumschat is not eligible for parole until February 28, 1984.[1] Mr. Dumschat has appeared before the defendant Connecticut Board of Pardons several times during his prison term. Each time the board has either continued his application or denied relief. Plaintiff seeks a declaratory judgment that the defendants are acting in violation of the fourteenth amendment because they fail to provide any written reasons for their decisions.[2]

In assessing whether the plaintiff is entitled to invoke the protections of the due

---

1. Conn.Gen.Stat. § 54–125, amended P.A. 76–336 § 7 (June 9, 1976). Plaintiff contends that "lifers" and other long-term inmates constitute a special class of applicants before the board. That evidence has not been rebutted by the state.

2. By stipulation of the parties, the testimony of Mr. Richard Lublin, Chairman of the Board of Pardons, given in the case of *Carrona v. Manson*, Civ. 74–377 (hereinafter *Carrona* Tr.), was made part of the record in this action. *Carrona*, a similar law suit, was dismissed as moot when Mr. Carrona received a pardon.

process clause, the analysis must center on whether the nature of his interest in a pardon is "one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). *Cf. Meachum v. Fano,* 427 U.S. 215, 224, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). The extent of process, if any, an individual should be accorded requires consideration of three factors: (1) the private interest involved; (2) the risk of erroneous deprivation under existing procedures and the probable value of additional procedural safeguards; and (3) the governmental interest in maintaining the present practice. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *Cf. United States ex rel. Johnson v. Chairman, New York State Board of Parole,* 500 F.2d 925, 929 (2d Cir.), *vacated as moot sub nom., Regan v. Johnson,* 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289 (1974).

The power to pardon is traditionally viewed as a "prerogative" of the executive "which ought not be 'fettered or embarrassed.'" *Schick v. Reed,* 419 U.S. 256, 263, 95 S.Ct. 379, 384, 42 L.Ed.2d 430 (1974). The argument that the denial of a pardon in this case is a sufficiently "grievous loss" to warrant a statement of reasons must rest therefore on the unique role the Connecticut Board of Pardons has historically played in the state's correctional process.

## I.

The power to pardon in Connecticut resides in a legislatively created administrative agency. Connecticut stands outside the traditional scheme of clemency through application to the state's chief executive. The Constitutional Convention of 1818 rejected a proposal to vest a full pardon power in the Governor and limited that offi-

cial's authority to the grant of reprieves after conviction "until the end of the next session of the general assembly, and no longer."[3] Rather, the power to commute sentences remained with the legislature.[4] In 1883, the legislature vested "the jurisdiction of granting commutations of punishment and release, conditional or absolute, from the state prison" in a "board of pardons."[5] The board has continuously exercised that jurisdiction from 1883 to the present.

Although the board has the power to grant absolute pardons to inmates, that power is never employed. Instead, the board commutes an inmate's minimum sentence so as to render him eligible for parole at an earlier date. For persons sentenced to long imprisonment terms, particularly "lifers" like plaintiff, accelerated release may often be a two-step process consisting of a commutation of their minimum sentence by the pardon board and then a parole from the board of parole. It is plaintiff's contention that with respect to such inmates, a hearing before the pardon board is a kind of preliminary parole hearing.

As currently constituted, the board of pardons consists of five members, two of whom must be attorneys, one a physician, one a person trained in the social sciences, and one a justice of the Connecticut Supreme Court.[6] With the exception of the justice designated by the Supreme Court, the board members are appointed by the Governor with the advice and consent of the General Assembly. They hold sessions at the state prison at which petitions for pardon are heard. Procedures before the board are set forth in informal but published rules.[7] A petitioner has the right to appear in person to argue his case to the board. *But see Zurak v. Regan,* 550 F.2d 86 (2d Cir.), *application for cert. pending,* No.

---

**3.** Conn.Const. art. IV, § 10.

**4.** *See* Note, *The Pardoning Power: Historical Perspective and Case Study of New York and Connecticut,* 12 Col.J.Law & Soc.Prob. 149, 161–62 (1976).

**5.** Conn.Laws, Chap. 108 (1883).

**6.** The present statutory scheme may be found at Conn.Gen.Stat. § 18–24a *et seq.*

**7.** Rules for Petitions to the Board of Pardons of the State of Connecticut (1959). The board has in fact maintained published rules since its inception in 1883.

76–1564, 45 U.S.L.W. 3755 (U.S. May 9, 1977). He may be assisted by counsel and can present witnesses on his behalf. The board does not adhere to any strict rules of evidence and allows petitioners great latitude in the kind of evidence they wish to produce. In addition, the board will frequently permit the applicant access to the non-confidential portions of his prison record.[8] *But see Williams v. Ward,* 556 F.2d 1143 (2d Cir. 1977); *Holup v. Gates,* 544 F.2d 82 (2d Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977). The hearings also take on certain aspects of an adversary proceeding. Under its rules, the board notifies the State's Attorney of the county of the petitioner's conviction of the pending application. The State's Attorney may appear and present witnesses in opposition to the petition. Despite the extensive procedural rights afforded inmates at such hearings, the board does not offer any reasons for its denial of a pardon.

## II.

■ Although the Supreme Court has yet to determine whether a parole applicant has a sufficient conditional liberty interest to require fourteenth amendment protection, *see Scott v. Kentucky Parole Board,* 429 U.S. 60, 97 S.Ct. 342, 50 L.Ed.2d 218 (1976), it is settled in this Circuit that parole release decisions are subject to certain due process safeguards.[9] In *United States ex rel. Johnson v. Chairman, New York State Board of Parole, supra,* 500 F.2d at 934, the Second Circuit held that under the fourteenth amendment, an inmate whose application for parole has been denied must be furnished with a statement of reasons and facts relied on "sufficient to enable a reviewing body to determine whether parole has been denied for an impermissible reason or for no reason at all."

*Johnson* relied on the decision of the Supreme Court in *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), which concerned parole revocation. According to Judge Mansfield, *Morrissey*

"rejected the concept that due process might be denied in parole proceedings on the ground that parole was a 'privilege' rather than a 'right.' . . . Parole was thenceforth to be treated as a 'conditional liberty,' representing an 'interest' entitled to due process protection. A prisoner's interest in prospective parole, or 'conditional entitlement,' must be treated in like fashion. To hold otherwise would be to create a distinction too gossamer-thin to stand close analysis. Whether the immediate issue be release or revocation, the stakes are the same: conditional freedom versus incarceration."

500 F.2d at 927–28. The court buttressed its conclusion that an inmate had a legitimate liberty expectation of parole on the fact that the average prisoner had a better than 50 per cent chance of being granted relief prior to expiration of his prison term. The reasoning of *Johnson* was expanded to *Zurak v. Regan, supra,* to mandate a statement of reasons for inmates denied conditional release and in *Coralluzzo v. New York State Parole Board,* 420 F.Supp. 592 (W.D.N.Y.1976) to require reasons when setting a minimum period of incarceration for inmates subject to indeterminate sentences. *See also Cardaropoli v. Norton,* 523 F.2d 990 (2d Cir. 1975) (due process must be extended to prisoners prior to classification as "Special Offenders"). Those same factors which led the court in *Johnson* to find a liberty interest in an inmate's expectation of parole lead me to conclude that due process attaches to the denial of a pardon by the Connecticut Board of Pardons, at least with respect to petitioners like the plaintiff who have been sentenced to long minimum terms of imprisonment.

■ While styled a board of pardons, it is agreed that the board has never in recent history granted an inmate an absolute pardon and immediate release. When the board grants relief to the long-term inmate, it merely lowers his minimum sentence so

---

8. *Carrona* Tr. at 44–45, 51; *Dumschat* Tr. at 40.

9. For a survey of the recent cases, *see Williams v. Ward, supra,* 556 F.2d 1143 at 1155–1159.

as to make him eligible for parole. Although parole after pardon may not be automatic, the two decisions are intimately connected. Mr. Gates, Chairman of the Board of Parole, testified that:

> "in the vast majority of cases, I would say 90 percent of the cases at least, a commutation by the Pardons Board results in parole by the Parole Board." [10]

Mr. Lublin, Chairman of the Board of Pardons, concurred in this analysis, saying:

> "We're cognizant of the fact that almost everybody who gets turned over by the Board of Pardons to the Parole Board is released." [11]

It is the *nature* of the interest sought to be protected that determines whether due process applies. *Zurak v. Regan, supra,* 550 F.2d at 92–93. The consequences to the lifer or long-term inmate of proceedings before the pardon board are immense. He becomes eligible for parole. The ultimate interest at stake here is the same as that considered in *Johnson* and *Zurak,* "conditional freedom versus incarceration."

■ Moreover, the long-term inmate's expectation of pardon is a justifiable one rooted in state practice. *See Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). Mr. Gates, who has been associated with the Connecticut correctional system and dealt with the pardons board for some 35 years, testified that at least 75 percent of all lifers received some favorable action from the pardon board prior to completing their minimum sentences. He stated that in his nine years as Chairman of the Board of Parole, of the many lifers who appeared before the board for parole consideration only three had served the statutory minimum of 20 years.[12]

These statistics compare favorably with those before the court in *Johnson* where the New York State Parole Board released 75.4 per cent of the inmates that came before it and 54 per cent of all prisoners in the sampled jurisdictions left prison as parolees.[13] *Johnson v. Chairman, New York State Board of Parole, supra,* 500 F.2d at 928. Where, as in Connecticut, the state has set up a statutory process for granting commutations of sentence, established an administrative body to hear petitions and implement that statute, and granted such relief to at least three-quarters of the long-term inmates appearing before it, I think it clear that the denial of a pardon to such inmates implicates a liberty interest requiring due process protections.

### III.

The importance of articulating reasons for action taken by prison officials that adversely affects an inmate's conditional liberty interest has been repeatedly emphasized in this Circuit. *See, e. g., Zurak v. Regan, supra,* 550 F.2d at 86, *Haymes v. Regan,* 525 F.2d 540, 543–44 (2d Cir. 1975); *United States ex rel. Johnson v. Chairman, New York State Board of Parole, supra.* No one disputes that the board of pardons is embodied with exceptionally broad discretion in the exercise of its statutory function and that its decisions may be subject to only the narrowest review. But the very breadth of that discretion militates that the board provide a statement of reasons to protect "the inmate against arbitrary and capricious decisions or actions based upon impermissible considerations." *United States ex rel. Johnson v. Chairman, New York State Board of Parole, supra,* 500 F.2d

10. *Dumschat* Tr. at 17.

11. *Id.* at 36.

12. *Id.* at 14–16. While it is not clear at exactly what point in their incarceration lifers generally receive a form of pardon, Mr. Gates indicated that most commutations "appeared to come between 14 and 17 years."

13. Although the statistical evidence furnished by the board is not as extensive as might be desired, it is entirely consistent with Mr.

Gates's testimony. In an affidavit furnished to the court, Mr. Lawrence Schwartz, Secretary of the Board of Pardons, noted that the board held 379 hearings on petitions between April 1974 and November 1976. It is impossible to determine how many of these hearings involved petitions from the same inmate. The board granted relief in only 25 cases. Of these 25 cases, though, 12 concerned inmates serving life sentences.

at 929. While the board asserts no right to act in an arbitrary or discriminatory manner, it is near impossible to review such claims of infringement without some statement explaining the basis for its actions.

The value of this procedural safeguard cannot be doubted. The requirement that the decisionmaker set forth specifically the reasons for denying a pardon "promotes thought by the decider," and impels him "to cover the relevant points" and "eschew irrelevancies." Frankel, *Criminal Sentences* 40–41 (1973), *cited in United States ex rel. Johnson v. Chairman, New York State Board of Parole, supra,* 500 F.2d at 931, and *Haymes v. Regan, supra,* 525 F.2d at 544. The possibility of arbitrary action by the board is not unreal. The board hears some 60 petitions in a given sitting. After the completion of the evidence in the cases heard during the day, the board goes into executive session. Typically, the secretary to the board reads the name of the applicant and asks if anyone wishes to grant relief to the applicant. If all members remain silent, the petition is denied.[14] There is no assurance that each of the members has actually considered all the information contained in the file or that the members are applying a consistent set of criteria.

During the hearings, Mr. Lublin commented:

> "It's very difficult to give reasons. Sometimes you have somebody who is definitely insane. You don't have a psychiatric report in front of you, but from what he says right at the hearing, you can tell he's insane.
>
> "You're going to write a reason that we're not allowing you out because you're insane?" [15]

The articulation of reasons will help insure a decision that has some basis in the record before the board.

14. *Dumschat* Tr. at 33.

15. *Id.* at 38.

16. *Carrona* Tr. at 36.

17. The court holds that the plaintiff David K. Dumschat is entitled to a statement of reasons having been denied a pardon. I need not decide on the facts of this case at what point in

In addition, a statement of reasons serves a rehabilitative function by informing the petitioner what is lacking in his application and how he might better himself in order to obtain a pardon from the board. Mr. Lublin stressed at several instances that the inmate bears the burden of showing why should be granted a pardon, that the prisoner "has to give a very good reason why he should be granted [relief]." [16] But under the present system of summary decision, the inmate has no way of knowing what a good reason might be in the eyes of the board members. He is left in the dark as to the basis of decisions affecting his own release.

When one compares the nature of the inmate's interest and the need for procedural safeguards with the public interest in maintaining the existing procedures, *see Mathews v. Eldridge, supra,* 424 U.S. at 335, 96 S.Ct. 893 (1976), I think it plain that the balance tips decidedly in favor of the inmate and the articulation of a statement of reasons. We deal here only with inmates like plaintiff sentenced to long minimum terms and who have served a substantial portion of that sentence.[17] Approximately three-quarters of these inmates do eventually receive some form of pardon from the board. The administrative burden in supplying a statement explaining a denial to the remaining applicants would not appear particularly onerous.

■ I conclude therefore that the fourteenth amendment requires that the Connecticut Board of Pardons furnish plaintiff a written statement of reasons and facts relied on when he is denied a pardon. A declaratory judgment shall enter in accordance with this opinion.

SO ORDERED.

his incarceration an inmate acquires a justifiable expectation of pardon and a liberty interest sufficient to invoke the protection of the fourteenth amendment. I conclude only that due process attaches to the denial of a pardon to an inmate like Dumschat sentenced to life imprisonment who has served almost two-thirds of his minimum term.