556 F.2d 1143
 44 A.L.R.Fed. 355
 Michael WILLIAMS, Plaintiff-Appellee,
v.
Benjamin WARD, Commissioner of the New York State Department
of Correctional Services and Edward R. Hammock,
Chairman, New York State Board of
Parole, Defendants-Appellants.
 No. 457, Docket 76-2105.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 22, 1976.
Decided May 26, 1977.
 
 Stephen M. Latimer, New York City (Michael C. Fahey, and Bronx Legal Services Corp., New York City, of counsel), for plaintiff-appellee.
 Robert S. Hammer, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen., State of N. Y., and Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, of counsel), for defendants-appellants.
 Before FRIENDLY, HAYS and MULLIGAN, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 This appeal from an order of the District Court for the Southern District of New York raises a question of the extent to which the due process clause of the Fourteenth Amendment confers upon a prison inmate eligible for parole consideration the right to inspect his institutional files, where those may be consulted by the parole board in deciding on his parole. Related questions already have been faced, in varying form and with varying result, by two previous panels of this court. In the particular circumstances of this case, we find that disclosure of the contents of the files was not constitutionally required.
 
 
 2
 Plaintiff-appellee Michael Williams is a prisoner in the custody of the New York State Department of Correctional Services. He was indicted in 1964 for two counts of murder in the first degree and one count of robbery in the first degree, pleaded guilty to two counts of second degree murder, and was sentenced on May 27, 1964 to concurrent terms of twenty years to life. After resentencing in 1969 for purposes of permitting an appeal, his conviction was affirmed without opinion by the Appellate Division, 319 N.Y.S.2d 595 (App.Div. 2d Dept. 1971), with leave to appeal to the New York Court of Appeals denied. Although under earlier New York law Williams would not have been eligible for parole consideration until completion of his minimum term, New York Correction Law § 212 (McKinney 1968), he became eligible for parole consideration on September 1, 1975 by virtue of a statutory reduction in minimum sentences, L.1975, c. 343, § 1, New York Correction Law § 212-a (McKinney 1976), and was accorded an appearance before the Parole Board on September 11, 1975.
 
 
 3
 In April 1975, apparently in the course of his unsuccessful civil rights suit in the Eastern District of New York against two police officers who had questioned him in connection with the murders, Williams v. Gamble, Nos. 69-C-1253, 70-C-155, appeal dismissed pursuant to Rule 0.18(7), No. 75-2075 (2 Cir. 1976), Williams learned that his prison files contained two letters whose contents he considered prejudicial. Those letters stemmed from an incident initiated by Williams himself: In April 1971 Williams had written a letter to Justice John E. Cone of the New York Supreme Court, who had sentenced Williams in 1964 and resentenced him in 1969, containing the text set out in the margin.[1] Copies of this letter also were sent by Williams to John Hughes, Chairman of the State Senate Judiciary Committee, and Thomas McCoy of the New York State Judicial Conference. On May 3, 1971, at the request of Justice Cone, Charles Fastov, who was Chief Probation Officer of the Second Judicial District, New York Supreme Court, wrote to Russell Oswald, the Commissioner of Correctional Services, and to Paul J. Regan, then Chairman of the New York State Board of Parole, enclosing a copy of Williams' letter and stating that "Williams has a history of mental disturbance and the attached letter points to the probable need for an updated psychiatric review of his condition." In addition, on August 5, 1974, Justice Cone wrote to Oliver Tweedy of the Executive Clemency Bureau, State Department of Correctional Services, enclosing copies of Williams' letter and Fastov's 1971 letter to Commissioner Oswald, and stating that,
 
 
 4
 I do not under any circumstances recommend commutation of sentence for Michael Williams, as he has a history of mental disturbance.
 
 
 5
 In my opinion he is dangerous. Herewith is a photocopy of a threatening letter addressed to me from Michael Williams . . . .
 
 
 6
 When he learned that the letters from Fastov and Justice Cone were in existence, Williams apparently wrote to the Parole Board Chairman and the Commissioner of Correctional Services stating that the information in the letters concerning a history of mental disturbance was false, and asking that the letters be removed from the prison and parole board files and that no reference be made to the information when he was considered for parole or for temporary release programs. When, allegedly, no response was received to these letters, Williams filed the instant suit pro se on August 6, 1975, under 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343(4), claiming that he had been denied due process in not being afforded copies of the letters and not being given the opportunity to answer the allegations. As relief, he asked (1) that the court order defendants to remove "the false information" (presumably, the two letters) from his institutional files and (2) that the Department of Correctional Services and the New York Parole Board "be enjoined from accepting any such recommendations and other informations from the judges, prosecutors, and other outside sources without first supplying the plaintiff with a copy thereof and affording him 14 days to answer the charges in the information and recommendations and respond in writing."
 
 
 7
 A month later plaintiff had his hearing before the Parole Board, at which board member Pierro questioned Williams concerning his attitude toward his past criminal offense and past drinking problem, his failure to participate in the Alcoholics Anonymous or group therapy programs in the prison, and his decision not to pursue a high school equivalency diploma or college courses even though he had no employment record before his arrest and expressed a desire to work as a para-legal upon his parole release.
 
 
 8
 The Board denied parole, continuing Williams in custody until September 1977 and gave the following written statement of reasons for the denial:
 
 
 9
 The violent and vicious nature of the crimes.
 
 
 10
 Institutional reports indicate that you may benefit from the treatment which is available to you at this institution and in which you have not participated and which we feel is necessary for your rehabilitation.
 
 
 11
 There is no indication that you have utilized available programs to prepare yourself for parole release at this time.
 
 
 12
 Williams subsequently wrote to the Acting Chairman of the Parole Board, Frank Caldwell, asking for reconsideration of the denial; Caldwell replied on October 28, 1975 that
 
 
 13
 I feel that the decision rendered by the Parole Board was appropriate based on the seriousness of the crime for which you were convicted.
 
 
 14
 and in response to a second letter from Williams, wrote on November 21, 1975 that
 
 
 15
 I wish to again indicate to you that the decision rendered by the Parole Board in denying you Parole release was appropriate (A)s I indicated to you the Parole Board not only considers a person's past pattern of criminal behavior, but also his institutional adjustment and future potentials in the community. Based on all of the above the reviewing commissioners felt that if released you would not remain at liberty without violating the law and that your release would not be compatible with the welfare of society.
 
 
 16
 After the parole hearing, Williams also applied for participation in a work release program at the Eastern Correctional Facility in Napanoch, New York, where he was then confined. This application was denied on November 6, 1975 by the Temporary Release Committee at the prison on the ground that Williams had too much time left before his next scheduled parole hearing.[2] A subsequent application for work release made in December 1975 was denied, according to plaintiff's affidavit, on the grounds of the "Assaultive nature of present offenses" and his "Lack of meaningful work and educational program", although Williams states he believes the "real basis for the denial . . . is because of the false information in his files." (Plaintiff's March 30, 1976 affidavit of facts at 2, 3).
 
 
 17
 Finally, Williams applied for participation in the prison's furlough program for home visits in July 1975 and November 1975; these applications were denied each time, with "Nature of Offense" given as the reason.
 
 
 18
 In the meantime, Williams' Southern District action began to change its focus to the September 1975 denial of parole. After securing an extension of time, defendants moved on November 12, 1975 to dismiss the complaint for failure to state a claim on which relief may be granted, Fed.R.Civ.P. 12(b)(6); the district court, characterizing plaintiff's claim as "that his reputation has been hurt and his eligibility for parole and other privileges has been severely limited by the ex parte inclusion in his institutional files of certain material classifying him as mentally disturbed, of which he was given no prior notice or opportunity to contest its factual basis," denied the motion to dismiss on the basis of Cardaropoli v. Norton, 523 F.2d 990 (2 Cir. 1975). On January 5, 1976, Williams moved for summary judgment, Fed.R.Civ.P. 56, claiming that the September 11 parole hearing had been held before he had opportunity to learn that he has been "classified" as mentally disturbed, thus depriving him of the opportunity to contest that characterization, and requesting for the first time an order to show cause why he should not be granted a new parole hearing or, in the alternative, be released on parole. The district court, recognizing that a claim for immediate release sounds in habeas corpus and cannot be granted under 28 U.S.C. § 2254 unless a plaintiff has exhausted state remedies, elected to ignore Williams' request for immediate release and to "focus instead on the other forms of relief demanded by plaintiff," (April 9, 1976 order, at 4 n.1).
 
 
 19
 The district court's consideration of Williams' motion for summary judgment was deferred because of deficiencies in the defendants' affidavit in opposition; on April 9, 1976 the court ordered that the deficiencies be cured within 20 days and also that the defendants turn over for in camera inspection "all material in plaintiff's institutional files which contain any reference to his alleged mental instability, including the alleged threats."On May 3, 1976, the Assistant Attorney General newly assigned to the Williams case wrote to the district court suggesting that the decision rendered by Judge Judd in Williams' related habeas corpus action in the Eastern District on April 12, 1976, Williams v. Caldwell, 75-C-1948, established as res judicata that the reasons given for the denial of Williams' parole were adequate as a matter of federal law; the letter, a copy of which was sent to Williams, requested that Judge Knapp's April 9 order be reconsidered in light of the April 12 Eastern District judgment. The defendants were apparently informed orally by the court that the order would remain in effect. Defendants state that they also informally requested additional time to brief whether plaintiff's state probation report was properly subject to disclosure in the case.
 
 
 20
 When the defendants still had not complied fully with the April 9 order two months later, Judge Knapp filed an order granting Williams' motion for summary judgment in default on June 11, 1976, ordering the defendants to "Forthwith delete all materials in plaintiff's parole file classifying him as mentally disturbed" and "Forthwith grant plaintiff a new release hearing, at which none of such material is to be considered".
 
 
 21
 On July 9, 1976, the defendants filed notice that they would move to vacate the entry of default pursuant to Fed.R.Civ.P. 55(c), and submitted the material requested by the district court including the submission for in camera inspection of all materials arguably characterizing plaintiff as emotionally disturbed: the latter materials were a presentence report dated April 30, 1964; psychiatric progress notes dated July 8, 1964, May 31, 1973, June 12, 1974, and August 26, 1975; a pre-parole hearing data sheet dated July 30, 1975; Williams' 1971 letter to Justice Cone; and the letters from Chief Probation Officer Fastov and Justice Cone. In support of their motion to vacate, defendants described their delay in responding to Williams' motion for summary judgment as inadvertent, and argued that an order requiring the expunging of the materials concerning Williams' mental health was unwarranted because any opinions characterizing him as mentally disturbed were rendered on the basis of professional judgment, and because state law required the Parole Board to have before it any available evidence of mental condition for each parole applicant, New York Correctional Law §§ 6-a, 211, and required that any inmate serving a sentence for murder undergo psychiatric evaluation prior to appearance before the Parole Board, 9 New York Code of Rules and Regulations § 1.5. In addition, the defendants argued, the in camera material was either privileged from disclosure or already known to Williams.
 
 
 22
 On July 23, 1976, Judge Knapp filed a Memorandum and Order accepting defendants' excuses for delay, but rejecting their substantive defenses as a matter of law. Apparently viewing its prior order requiring deletion of material from Williams' institutional file merely as a prod to secure the defendants' answer to Williams' motion for summary judgment, the court stated that the "issue before us . . . is not whether the plaintiff is entitled to a 'sanitized' file devoid of adverse information, but rather, whether he is entitled to be informed of the nature of that adverse information and to be given an opportunity to rebut it." Citing this court's decisions in Velger v. Cawley, 525 F.2d 334 (1975), reversed on other grounds sub nom. Codd v. Velger, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977), and Cardaropoli v. Norton, 523 F.2d 990 (1975), the district court stated that "It is beyond cavil that classification as mentally disturbed imposes a stigma to such an extent as to constitute a deprivation of 'liberty' within the meaning of the due process clause," and that "plaintiff has alleged and defendants nowhere dispute that he has been denied social furloughs, participation in work-release and release on parole as a direct result of the inclusion in his file of the adverse information here involved." The defendants' claim that certain documents were privileged from disclosure could be accommodated, said the court, by providing Williams with "a summary of the materials involved and the conclusions stated therein" when the confidentiality of the source had to be maintained.
 
 
 23
 The district court thereupon specified (1) that within 30 days defendants should provide Williams with "copies of all unconfidential material in his institutional file," and "a fair summary of confidential material, which summary shall not reveal sources, but shall fairly state any conclusions adverse to the plaintiff which may be drawn therefrom"; and (2) that no sooner than 10 days after providing such material, but within 60 days of the court's order the Parole Board should grant Williams a new parole release hearing. Judge Knapp incorporated these two requirements in a final judgment order filed August 5, 1976. The final judgment did not include the relief originally afforded Williams of expunging from his parole file all materials classifying him as mentally disturbed and a new release hearing at which none of the expunged material could be considered, a disparity which is puzzling since Judge Knapp declined to vacate his June 11 entry of default; Williams, however, does not attack the final judgment and order. It is from the August 5 judgment that defendants now appeal; the court granted a stay of Judge Knapp's order pending appeal.
 
 
 24
 On appeal, the defendants argue that Williams' action should have been treated as a habeas petition and been dismissed by the district court for failure to exhaust state remedies under Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); that Williams' claim in the Southern District was barred by Judge Judd's dismissal of his Eastern District petition; and that parole applicants are entitled to no due process protections at all and certainly, under our decisions in Haymes v. Regan, 525 F.2d 540 (2 Cir. 1975), and Billiteri v. United States Board of Parole, 541 F.2d 938 (2 Cir. 1976), no protection as extensive as a right of prior discovery of institutional and parole files.
 
 I.
 
 25
 A preliminary question which must be resolved concerns the effect of the default judgment on the scope of our review. Appellee argues that because Judge Knapp declined to grant defendants' motion to vacate the entry of default and, in the August 5 final judgment, granted plaintiff's motion for summary judgment "on default", we need not reach the merits in order to affirm the judgment below. We see no basis for this contention, for the district court made clear that it declined to set aside the entry of default solely because of its view that the defendants had no meritorious defense to the action. It stated in its July 23 order that
 
 
 26
 we accept as valid counsel's excuses for delay in responding to plaintiff's motion for summary judgment and the various directives of the court, (but) we find that defendants' proffered defenses are without merit. For that reason, the motion to vacate is denied. (Emphasis added).
 
 
 27
 and that
 
 
 28
 We wish to make crystal clear that we have exercised all our discretion in the defendants' favor and have denied the motion to vacate solely because in our view the defense suggested is as a matter of law unavailable.
 
 
 29
 Because Judge Knapp viewed the judgment as in effect a ruling on the merits, we do not think he intended by the form of his judgment to preclude our review on the merits. We would in any event doubt whether a district court could properly decline to set aside an entry of default when it has "accept(ed) as valid counsel's excuses for delay" and where, as we determine here, the party seeking to set aside the default has a substantial meritorious defense. Cf. 6 J. Moore, Federal Practice P 55.10(1), at 55-233-36 & n. 21 (2d ed. 1976); 10 C. Wright & A. Miller, Federal Practice and Procedure §§ 2693, 2697 (1973); Gill v. Stolow, 240 F.2d 669, 670 (2 Cir. 1957); SEC v. Management Dynamics, Inc., 515 F.2d 801, 814 (2 Cir. 1975); Horn v. Intelectron Corp.,294 F.Supp. 1153, 1155 (S.D.N.Y.1968); Hazzard v. Weinberger, 382 F.Supp. 225, 228 (S.D.N.Y.1974), aff'd without opinion, 519 F.2d 1397 (2 Cir. 1975); SEC v. Vogel, 49 F.R.D. 297, 299 (S.D.N.Y.1969). Rather than remand for the formal vacation of the default judgment and entry of summary judgment simpliciter, we will treat Judge Knapp's July 23 and August 5 orders as constituting in effect a vacation of the default judgment and substitution of ordinary judgment in favor of plaintiff.
 
 II.
 
 30
 Appellants argue that because Williams' object in this action was ultimately to gain release from prison through a new parole hearing unaffected by the disputed material in his institutional files, his action should have been treated as one for habeas corpus under Preiser v. Rodriguez, supra, and been dismissed for failure to exhaust state remedies pursuant to 28 U.S.C. § 2254(b).
 
 
 31
 The problem of deciding which prisoner petitions must be considered exclusively as petitions for habeas corpus under § 2254 requiring exhaustion of state judicial remedies and which lie properly as civil rights actions under 42 U.S.C. § 1983 where no exhaustion of state remedies is required, has not been an easy one. A petition which seeks release because of a constitutional defect in the conviction clearly falls within the former category, e. g., Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953); Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954). A petition protesting against prison conditions, but not seeking release, equally clearly falls within the latter, e. g., Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964) (inmate's right to purchase religious publications); Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971) (living conditions and disciplinary measures while confined in maximum security); Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (use of solitary confinement as a disciplinary measure); Sostre v. McGinnis, 442 F.2d 178, 182 (2 Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972).[3] In Preiser v. Rodriguez the Supreme Court ruled with respect to an intermediate category of petitions claiming that procedures with respect to the disallowing of good-conduct-time credits were constitutionally defective; it held that these were in substance petitions for habeas corpus since allowance of the credits would lead automatically either to immediate or to accelerated release, and were not cognizable by federal courts in the absence of exhaustion of state remedies.
 
 
 32
 A petition challenging parole procedures but not demanding release or the granting of parole differs from the petitions before the Court in Preiser v. Rodriguez in an important respect. Although the relief sought by petitioner may improve his chances for parole, the question of his release and of the length of his confinement still lies within the sound discretion of the board, unlike Preiser where the restoration of good-conduct-time credits would have resulted automatically in the shortening of the prisoners' confinement. As we noted in Haymes v. Regan, 525 F.2d 540, 542 (2 Cir. 1975), where a parole applicant sought disclosure of the release criteria observed by the New York State Parole Board in passing on parole applications but, in his amended complaint, did not seek release from custody, "Since it is the manner of parole decision-making, not its outcome, that is challenged, appellant does not present a complaint of the sort in Preiser v. Rodriguez, . . . for which habeas corpus would be appropriate." Similarly, in United States ex rel. Johnson v. Chairman, New York State Board of Parole, 500 F.2d 925, 926 (2 Cir.), vacated and remanded as moot sub nom. Regan v. Johnson, 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289 (1974), a petition filed pro se under 28 U.S.C. § 2254 but seeking only a statement of reasons for the denial of the inmate's parole was treated as an application for injunctive relief under § 1983.
 
 
 33
 On the basis of these decisions we think that, standing alone, Williams'request for a new parole hearing (made in his motion for summary judgment which Judge Knapp treated as an amendment of the original complaint) was a remedy available outside habeas corpus, since it too concerned the manner of parole decision making, not its outcome. We recently suggested as much in Billiteri v. United States Board of Parole, 541 F.2d 938, 946 (2 Cir. 1976):
 
 
 34
 The district court has no power to substitute its own discretion for that of the Board. If the court has found that the Board has abused its discretion, it may remand the case to the Board with instructions for correction. If the case was before the court on a petition for habeas corpus, it may order compliance within a reasonable period, failing which it may order the petitioner discharged from custody.
 
 
 35
 Defendants urge that even if this be true, a different outcome is required in this case because Williams, in his amendatory motion for summary judgment, asked, as an alternative to a new parole hearing, for immediate release. Judge Knapp handled the problem by choosing to "ignore" the request for release:
 
 
 36
 Rather than dismiss plaintiff's complaint as sounding in habeas corpus thus calling into play the requirement of pleading exhaustion of state remedies we shall ignore the request for immediate release and focus instead on the other forms of relief demanded by plaintiff.
 
 
 37
 This was stated as a footnote to Judge Knapp's April 9, 1976 order requiring the state to answer plaintiff's motion for summary judgment, but must serve also as the jurisdictional basis of his June 11, 1976 order granting summary judgment and his August 5, 1976 final judgment order.
 
 
 38
 We do not think Judge Knapp's segregation of plaintiff's § 1983 claim from his habeas claim was improper under Preiser v. Rodriguez. The Preiser court itself dealt with the question how simultaneous claims for habeas and for § 1983 relief should be handled, concluding that the latter could be pursued in federal court at the same time that the exhaustion requirement for habeas was being met at the state level.
 
 
 39
 If a prisoner seeks to attack both the conditions of his confinement and the fact or length of that confinement, his latter claim, under our decision today, is cognizable only in federal habeas corpus, with its attendant requirement of exhaustion of state remedies. But, consistent with our prior decisions, that holding in no way precludes him from simultaneously litigating in federal court, under § 1983, his claim relating to the conditions of his confinement.
 
 
 40
 411 U.S. at 499 n. 14, 93 S.Ct. at 1841. In Wolff v. McDonnell, 418 U.S. 539, 554, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974), the Court again sanctioned the simultaneous pursuit of a § 1983 claim in federal court while meeting the exhaustion requirement for habeas, even where both forms of relief originally were sought in the federal complaint.
 
 
 41
 The complaint in this case sought restoration of good-time credits, and the Court of Appeals correctly held this relief foreclosed under Preiser. But the complaint also sought damages; and Preiser expressly contemplated that claims properly brought under § 1983 could go forward while actual restoration of good-time credits is sought in state proceedings. 411 U.S., at 499 n. 14 (93 S.Ct. 1827). Respondent's damages claim was therefore properly before the District Court . . . . (Footnote omitted).
 
 
 42
 Such simultaneous pursuit of claims in federal and state courts is permissible, Preiser suggests, even though adjudication of the federal claim may through res judicata determine the outcome of the state proceedings. Preiser v. Rodriguez, supra, 411 U.S. at 511, 93 S.Ct. 1827 (dissenting opinion); Wolff v. McDonnell, supra, 418 U.S. at 554 n. 12, 94 S.Ct. 2963. Particularly in light of the less stringent standards of pleading to which a pro se complaint should be held, see Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), we think Judge Knapp's segregation of the § 1983 claim was proper, although it would have been preferable for the district court to resolve the question of exhaustion and, if appropriate, dismiss the habeas claim, rather than simply "ignoring" the request for immediate release. Billiteri v. United States Board of Parole, supra, cited by defendants, is not to the contrary. There, a federal prisoner charged that the Parole Board had failed to give an adequate reason for denying him parole and asked the district court to order a new parole hearing or, in the alternative, his release on parole; thereafter the district court ordered that he should be discharged from federal custody unless the United States Parole Board reconsidered his application for parole within 30 days, and, when the procedures used in the parole reconsideration were deemed unsatisfactory, ordered his release. On appeal, though we held that habeas corpus was "the only appropriate means for testing out his claims to achieve the special relief requested," 541 F.2d at 948, this was in a case where the prisoner, represented by able counsel rather than pro se, not only included in his complaint a claim in the alternative for release, but, after the United States Parole Board had held a second parole hearing at the direction of the district court and had again denied parole, actively pursued the remedy by moving the district court to order his release on "bail" (motion of March 24, 1975) and on parole (plaintiff's brief, May 22, 1975), which latter motion was granted. The judgment here merely orders disclosure of institutional files and a new parole hearing.
 
 III.
 
 43
 Defendants' argument that Williams' § 1983 claim before Judge Knapp was barred by the earlier denial of his Eastern District petition against the Acting Chairman of the New York State Board of Parole, though inadequately briefed by the parties, cannot be passed over. On November 19, 1975, three months after his complaint in the Southern District was filed, two months after the Parole Board's denial of his application for parole, but a full month before he "amended" his Southern District complaint to include a request for a new parole hearing, Williams filed suit in the Eastern District for an "injunction against the denial of parole" and a direction that the Parole Board afford him a new hearing, claiming jurisdiction under § 1983 and 28 U.S.C. § 1343(3) and complaining that the Parole Board had improperly based its denial of his parole on the seriousness of the crime to which he had pleaded guilty and had wrongly concluded that he had failed to participate sufficiently in the rehabilitative programs of the prison, giving too little weight to those programs in which he had taken part and not specifying the programs in which he should participate in the future. In addition Williams' complaint stated,
 
 
 44
 the plaintiff's challenges are directed toward the determination of the decision to deny parole, and upon the alleged grounds for which the Board based its decision, (including) . . . the allegations made by the unknown officials of this facility who has filed reports indicating that the plaintiff required treatment before his release from prison. The sources of this information is not known to the plaintiff at this time and it has been impossible to secure copies of the reports by the plaintiff's attorney. (November 19, 1975 complaint, at 6).
 
 
 45
 The complaint continued,
 
 
 46
 The court should note that the parole board's decision indicates that reports were submitted by the officials of the Correctional facility at Napanoch, N.Y. stating that the plaintiff needed treatment without setting forth in the decision of the sources of the reports, and the types of rehabilitative treatment that the plaintiff should secure while confined under the two (2) years assessment fixed by the defendants. (November 19, 1975 complaint, at 7; emphasis in original).
 
 
 47
 and concluded,
 
 
 48
 The other grounds for the denial of release on parole (other than seriousness of the crime) is insufficient in fact and does not hold any substantial merits.The basis for the denial of parole was the failure of the plaintiff to participate in any of the rehabilitative programs at the Correctional facility, to prepare him for his rehabilitation and release into the community . . .. Also, that reports were filed by officials of the institution indicating that the plaintiff needed treatment which he was not taking advantage. The plaintiff alleges that the second portion of the parole board's decision . . . does not square with the accomplishments, and achievements of the plaintiff set forth in this complaint . . .. (November 19, 1975 complaint, at 9-10; emphasis in original).
 
 
 49
 Judge Judd treated the action as habeas corpus "(s)ince the thrust of this pro se complaint is an effort to obtain release from confinement" and granted Williams leave to amend his complaint in order to add as a defendant the superintendent of the Eastern Correctional Facility as "the person having custody of the person detained" under 28 U.S.C. § 2243, see Billiteri v. United States Board of Parole, 541 F.2d at 948, which Williams did. (Williams v. Caldwell, 75-C-1948, January 20, 1976 Memorandum and Order). Judge Judd characterized Williams' complaint as asking that the Board be required to "give consideration to the personal achievements (Williams) has had since his imprisonment," and, in his opinion of April 12, 1976, denied the petition on the grounds first, that Williams had failed to exhaust state remedies, and second, that the denial of parole was based on facially reasonable grounds and, under United States ex rel. Johnson v. Chairman, New York State Board of Parole, supra, that "a denial of parole, based on a facially reasonable ground, is not subject to review by a federal court." (April 12, 1976 Memorandum and Order, at 2). Williams did not seek any certificate of probable cause under 28 U.S.C. § 2253 to appeal Judge Judd's determination.
 
 
 50
 Before we examine the substance of the claims in the two actions, several preliminaries should be noted. First, although we might disagree with Judge Judd's characterization of the Eastern District complaint as lying only in habeas corpus, since Williams was apparently seeking there a vacation of the previous denial of parole and a new parole hearing rather than immediate release, still, by the rule of Stoll v. Gottlieb, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938), that court's determination of the source of its subject matter jurisdiction is binding on us as res judicata. However, even a judgment in habeas can effect issue preclusion in a § 1983 action if the issue was litigated and the decision was on the merits. Cf. Rosenberg v. Martin, 478 F.2d 520, 525-26 (2 Cir.), cert. denied, 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973). The Supreme Court observed in Preiser v. Rodriguez, 411 U.S. at 497, 93 S.Ct. at 1840 that "res judicata has been held to be fully applicable to a civil rights action brought under § 1983" by lower courts that have addressed the issue.[4] Although the Court there was addressing the effect on a § 1983 action of an earlier determination under a state remedy, there is no reason to think a different rule would apply where the first judgment is federal habeas. As the Preiser dissenters note, 411 U.S. at 509 n. 14, 93 S.Ct. at 1846 the major reason for a lenient rule of res judicata in § 1983 would be the "purposes underlying enactment" of the Ku Klux Klan Act of 1871, "in particular, the congressional misgivings about the ability and inclination of state courts to enforce federally protected rights", a concern hardly applicable where both proceedings are in federal court. Nor is there any statutory counterpart to the special res judicata rules established for successive habeas applications by 28 U.S.C. § 2244(b), to govern a situation where a petition under § 1983 follows an earlier habeas application.
 
 
 51
 Second, it is clear that even though the Southern District action was filed before the Eastern District action, when the latter proceeded to final judgment first it became a bar to the former if the underlying claims are the same. Restatement of Judgments § 43 (1942); Restatement of Judgments Second § 41.1 (Tentative Draft No. 1, March 28, 1973). Though this rule may seem harsh where the defendants rather than plaintiff were responsible for the slow progress of the first brought action, it is a risk the plaintiff assumed in choosing to pursue separate actions, rather than seeking to amend the complaint in the first-filed action.
 
 
 52
 Third, we do not think the fact that the Eastern District court gave alternative procedural and substantive grounds for dismissal of Williams' complaint should, in the circumstances of this case, rob the substantive ground of res judicata effect as to any identical claim. Restatement of Judgments § 49 comment c, at p. 196 (1942) notes, in regard to a judgment given in favor of a defendant:
 
 
 53
 Where the judgment is based upon two alternative grounds, one on the merits and the other not on the merits, there is a decision on both grounds although either alone would have been sufficient to support the judgment, and a subsequent action based upon the same cause of action is ordinarily barred.
 
 
 54
 Though there are critics of this rule, Restatement of Judgments Second § 48.1 comment e, at p. 49 (Tentative Draft No. 1, March 28, 1973); Developments in the Law Res Judicata, 65 Harv.L.Rev. 818, 845 (1952), we see no reason to depart from it in an instance where the plaintiff was pursuing the two actions simultaneously and thus could fully anticipate the potential barring effect of the earlier judgment in deciding not to appeal from Judge Judd's determination. Halpern v. Schwartz, 426 F.2d 102 (2 Cir. 1970), is not to the contrary. That case, which the court limited to "the facts before us," id. at 105, held that the earlier determination of intent to defraud, made in sustaining a claim of conveyance with intent to hinder and delay creditors as one of three grounds for adjudicating appellant Mrs. Halpern as a bankrupt, was not conclusive when the bankruptcy trustee sought to prevent her discharge from bankruptcy. The concern noted by the court there, that a debtor would be forced to clairvoyant anticipation of the effects of determined issues "on future indeterminate collateral litigation, which neither party can be sure will occur," and would be forced to take cautionary appeals even when the later litigation might never occur, is clearly not applicable here, where Williams was prosecuting both actions at once. The concern that "an issue not essential to the prior judgment may not have been afforded the careful deliberation and analysis normally applied to essential issues" is a real one in some circumstances, but not here, where Judge Judd had the substantive issue fully briefed, and discussed its factual basis at length in his January 20, 1976 opinion.[5]
 
 
 55
 Fourth, the mere fact that the remedy sought in one action is different from that sought in another does not alone suffice to differentiate the underlying claims. This was implicitly recognized by the Supreme Court in Preiser v. Rodriguez, 411 U.S. at 493-94, 497, 93 S.Ct. 1827; see also Restatement of Judgments § 65(1) (1942); Restatement of Judgments Second § 61.1(b) (Tentative Draft No. 1, March 28, 1973).
 
 
 56
 The important question is whether the claims in the Eastern District and the Southern District were the same. We think in main part they were. The claim underlying the plaintiff's amended Southern District request to view his institutional files and to secure a new parole hearing is that the reasons given by the board for denial of parole were incomplete or inadequately supported factually and that in fairness he should be given an opportunity to contest the grounds on which they actually relied. It can be strongly argued that this claim is precluded by Judge Judd's finding, in plaintiff's Eastern District challenge to the parole denial, that the scope of review for a federal court reviewing the determination of a parole board is only whether there were facially supported reasons given for denial of parole and his determination that there were such reasons in the New York State Board's September 1975 denial of Williams' parole application. Plaintiff's contention that his Eastern District petition did not raise the issue of disclosure of any adverse psychiatric information that might have undergirded the Parole Board's decision is inconsistent with the excerpts from the petition quoted above, which complained that the Parole Board had not set forth what institutional reports indicated that Williams "required treatment". Although Judge Judd gave more weight in his characterization of the complaint to Williams' argument that the Parole Board took too little account of his participation in prison programs, the judge did determine that the reasons for parole denial given by the board were facially supported and determined that finding such facial support marked the end of a federal court's proper review of parole decisions.
 
 
 57
 However, we recognize that the question of the identity of the claims in these two actions is a close one, in part because the disclosure mandated by Judge Knapp would have a prospective purpose in regard to Williams' upcoming September 1977 parole hearing even though it was sought in the amended Southern District complaint largely as a challenge to the Parole Board's stated reasons in the 1975 denial of parole. This, combined with the doubts that have been raised concerning the preclusive effect of an alternative ground of decision, makes us prefer to rest our reversal of the judgment below, see infra, on the merits rather than on the ground of res judicata.
 
 IV.
 
 58
 The consideration of what due process rights a parole applicant has with respect to his institutional files in the parole release process must begin with the Supreme Court's pronouncements concerning the nature of parole. That parole is an interest within the scope of the "liberty" protected by the due process clause was established, in regard to prisoners already released on parole and facing possible revocation, by Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Morrissey observed that a person already on parole is enabled
 
 
 59
 to do a wide range of things open to persons who have never been convicted of any crime. . . . Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. . . . The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions.
 
 
 60
 Id. at 482, 92 S.Ct. at 2600. Although the liberty of a parolee is not the "absolute liberty to which every citizen is entitled" but only a "conditional liberty properly dependent on observance of special parole restrictions," still it "includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others"; hence, the Court reasoned, a parolee's freedom "must be seen as within the protection of the Fourteenth Amendment" and its "termination calls for some orderly process, however informal." Id. at 480, 482, 92 S.Ct. at 2600. Among the procedural protections required was the provision of a preliminary hearing shortly after arrest to determine whether there was reasonable ground to believe a parole violation had occurred, which was to be conducted by an uninvolved decisionmaker, with prior notice to the parolee of the alleged violation; an opportunity for the parolee to present evidence in his own behalf and, if no security problem was posed, to question those who had given adverse information; and finally, a statement by the decisionmaker of the reasons for his decision and the evidence relied on. A later revocation hearing was required, prior to the final decision on revocation, with
 
 
 61
 (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witness and documentary evidence; (d) the rights to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.
 
 
 62
 Id. at 489, 92 S.Ct. at 2604. The Court warned, however, that "(w)e cannot write a code of procedure" and that it has "no thought to equate this second stage of parole revocation to a criminal prosecution in any sense." Id. at 488, 489, 92 S.Ct. at 2604. The Court declined to decide whether the parolee was entitled to assistance of retained counsel or appointed counsel for such a hearing if he is indigent.
 
 
 63
 Subsequently, in Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), the Court extended the same protections to revocation of probation, noting that after Morrissey, one could no longer deny due process protections because of the older view of probation as an "act of grace". Id. at 782, 93 S.Ct. 1756. The Court, however, rejected the contention that counsel had to be appointed for every revocation hearing for indigent parolees or probationers; where the facts were disputed and the parolee or probationer was uneducated, counsel could be useful, but often the violation was not in dispute and the case turned on factors claimed to show that revocation was unnecessary which were not susceptible of ordinary types of proof or were simple enough to be presented without the aid of counsel. The introduction of counsel would tend to make the parole or probation revocation hearing more adversarial and less attuned to the parolee or probationer's rehabilitative needs, would prolong the decisionmaking process and place a substantial burden on the state. "(D)ue process is not so rigid as to require that the significant interests in informality, flexibility, and economy must always be sacrificed." Id. at 788, 93 S.Ct. at 1763. Thus the right to counsel was made presumptive only where the parolee or probationer makes a timely and colorable claim that he has not committed the alleged violation of the conditions, or that there are substantial reasons which justified or mitigated the violation and that the reasons are complex or hard to develop and present.
 
 
 64
 Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), further extended the reach of due process to prison disciplinary proceedings which might result in the loss of good-time credits, but also emphasized that the procedural protections to be afforded must be shaped in light of the interest at stake and the institutional problems faced by prison administrators. The interest at stake in deprivation of good-time was, in the Court's view, of less moment than in revocation of parole.
 
 
 65
 The deprivation, very likely, does not then and there work any change in the conditions of his liberty. It can postpone the date of eligibility for parole and extend the maximum term to be served, but it is not certain to do so, for good time may be restored. Even if not restored, it cannot be said with certainty that the actual date of parole will be affected . . . .
 
 
 66
 Id. at 561, 94 S.Ct. at 2977. The procedural protections to be provided must, as in parole revocation, include advance written notice of the claimed violation, a hearing with some right to call witnesses and present documentary evidence, and a written statement by the factfinders as to the evidence relied on and the reasons for the disciplinary action. But the reach of these protections was necessarily limited by the problems of managing a prison. Therefore, the prison officials must be permitted the discretion to "keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect" evidence, id. at 566, 94 S.Ct. at 2980, although reasons for such restrictions should be given if possible. Similarly, the right to confront and cross-examine those furnishing evidence against the inmate could not be required as a matter of course, both to keep the proceedings of manageable proportion and because disclosure of the identity of an inmate who provided information would pose "high risk of reprisal within the institution" and would discourage inmates from coming forward in the future; even where the adverse witnesses were known, "the resentment which may persist after confrontation may still be substantial." Id. at 569, 94 S.Ct. at 2981.
 
 
 67
 (I)n the current environment, where prison disruption remains a serious concern to administrators, we cannot ignore the desire and effort of many States, . . . and the Federal Government to avoid situations that may trigger deep emotions and that may scuttle the disciplinary process as a rehabilitation vehicle.
 
 
 68
 Id. at 568, 94 S.Ct. at 2980. Similarly, the Court held that inmates did not have a right to outside counsel, because the insertion of counsel in such proceedings would increase their adversarial character, perhaps would interfere with rehabilitative goals, and would cause significant delay and expense. As a lesser measure, however, where an inmate was illiterate or the issues were complex, a counsel-substitute from among the prison population or staff was to be permitted.
 
 
 69
 In contrast to the recognition of due process in these cases, the Court held in Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and Montanye v. Haymes, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), that the due process clause does not entitle a state prisoner to a fact-finding hearing when he is transferred from one detention facility to another, even when the other prison is far more onerous unless state law itself conditions such transfers on the occurrence of misconduct. The Court distinguished Wolff by arguing that there the state had provided a statutory right to good time credit and specified it was to be forfeited only for serious misconduct, whereas in Meachum, Massachusetts law "conferred no right on the prisoner to remain in the prison to which he was initially assigned, defeasible only upon proof of specific acts of misconduct", 427 U.S. at 226, 96 S.Ct. at 2539. In Montanye the right to transfer prisoners was similarly reserved under state law, and this was held sufficient to defeat any due process claim even when the challenged transfer had followed upon an incident with the prison authorities.
 
 
 70
 Whether the Supreme Court will adjudge a parole applicant's interest in the prospect of conditional liberty on parole to be sufficient to trigger due process protections is still unsettled, see Scott v. Kentucky Parole Board, No. 74-6438, remanded for consideration of possible mootness, 429 U.S. 60, 97 S.Ct. 342, 50 L.Ed.2d 218 (1976). The past observations of the Court have pointed in both directions. In Morrissey, 408 U.S. at 482 & n. 8, 92 S.Ct. 2593, the Court, in concluding that a parolee has a protected liberty interest, quoted this court's opinion in United States ex rel. Bey v. Connecticut Board of Parole, 443 F.2d 1079, 1086 (2 Cir. 1971) (Kaufman, J.), that
 
 
 71
 It is not sophistic to attach greater importance to a person's justifiable reliance in maintaining his conditional freedom so long as he abides by the conditions of his release, than to his mere anticipation or hope of freedom.
 
 
 72
 and noted that "Though the State properly subjects (the parolee) to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison." However, in Wolff v. McDonnell, 418 U.S. at 565, 94 S.Ct. at 2979, the Court, speaking through Mr. Justice White, stated that a written statement by the factfinders in a disciplinary proceeding as to their reasons and the evidence relied on was important, in part because
 
 
 73
 the actions taken at such proceedings . . . are certainly likely to be considered by the state parole authorities in making parole decisions. Written records of proceedings will thus protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding. (Footnote omitted).
 
 
 74
 suggesting some concern for the accuracy of the record upon which a parole board acts. Finally, in Meachum v. Fano, 427 U.S. at 229 n. 8, 96 S.Ct. at 2540, the Court, again speaking through Mr. Justice White, stated that no hearing was required on prison transfers when the state had reserved the right to transfer a prisoner "for whatever reason or for no reason at all" and that this obtained even where the actual reasons were recorded in the prisoner's institutional file.
 
 
 75
 Nor do we think the situation is substantially different because a record will be made of the transfer and the reasons which underlay it, thus perhaps affecting the future conditions of confinement, including the possibilities of parole. The granting of parole has itself not yet been deemed a function to which due process requirements are applicable. See Scott v. Kentucky Parole Board, No. 74-6438, cert. granted Dec. 15, 1975, 423 U.S. 1031 (96 S.Ct. 561, 46 L.Ed.2d 404). If such holding eventuates, it will be time enough to consider respondents' contentions that there is unfounded information contained in their files.
 
 
 76
 Cf. Moody v. Daggett, 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976), holding that prisoner eligibility for rehabilitative programs in the federal system implicates no due process rights, because "Congress has given federal prison officials full discretion to control these conditions of confinement" under 18 U.S.C. § 4081.
 
 
 77
 It has been settled in this Circuit since 1974 that the interest of an inmate in a parole release decision is subject to some due process protections. In United States ex rel. Johnson v. Chairman, New York State Board of Parole, supra, 500 F.2d 925, we reasoned that the rationale of Morrissey v. Brewer necessarily extended to parole release as well as revocation, since "(w)hether the immediate issue be release or revocation, the stakes are the same: conditional freedom versus incarceration," id. at 928. The Supreme Court's recent emphasis in Meachum, Montanye and Moody on whether state or federal law has reserved the right to impose certain losses on an inmate or deny certain benefits for "no reason at all" does not, we think, undermine the result in Johnson ; though the criteria for parole release established by New York law involve judgments by the Parole Board that are subjective and predictive, the parole release process is nonetheless structured by state law in regard to what evidence about an inmate must be assembled and considered by the Board, New York Correction Law §§ 211, 214(2)-(4) (McKinney 1976); 7 N.Y.C.R.R. § 1910.15, 9 id. §§ 1.5, 1.9, and what criteria for release should be applied, New York Correction Law §§ 213, 214(4).[6] As we observed in Johnson, "The broad powers vested by statute in the Board do not relieve it from the duty of observing meaningful criteria for determining in each case when a prisoner's release 'is not incompatible with the welfare of society.' " 500 F.2d at 929-30.
 
 
 78
 In deciding what procedures must be observed in parole release decisionmaking as a matter of minimum due process, we have heretofore refrained from seeking to impose " 'the full trappings of adversary trial-type hearings which would in all likelihood so burden and delay the entire parole release process as to disadvantage the very interests of the inmates as well as the public interest.' " United States ex rel. Johnson v. Chairman, New York State Board of Parole, supra, 500 F.2d at 934, quoting Beckworth v. New Jersey State Board of Parole, 62 N.J. 348, 301 A.2d 727, 733 (1973). In Johnson, we held only that due process requires that an inmate who has been denied parole be given by the parole board a statement of reasons and of facts relied on "sufficient to enable a reviewing body to determine whether parole has been denied for an impermissible reason or for no reason at all." 500 F.2d at 934. Johnson expressed no difference with this Circuit's earlier conclusion in Menechino v. Oswald, 430 F.2d 403 (1970), cert. denied, 400 U.S. 1023, 91 S.Ct. 588, 27 L.Ed.2d 635 (1971), that "an inmate being considered for parole was not entitled to the full panoply of due process rights, including a specification of charges, counsel, and cross-examination", which would change the nature of parole determinations into full adversarial proceedings. 500 F.2d at 928.
 
 
 79
 A year later, in Haymes v. Regan, 525 F.2d 540 (2 Cir. 1975), we held that due process did not require that the New York State Parole Board disclose the release criteria observed in its parole decisions, so long as "a specific statement of reasons and underlying facts" was furnished to every prisoner denied parole, a requirement incorporated by New York Correction Law § 214 in June 1975. Such statements would "protect the inmate from arbitrary and capricious decisions or actions grounded upon impermissible considerations"; disclosure of a more general list of release criteria "would not at this time appreciably enhance the protection accorded the parole applicant." 525 F.2d at 544.[7]
 
 
 80
 The proposition that disclosure of parole files is required as a matter of due process might seem to be precluded by our next decision concerning parole release, Billiteri v. United States Board of Parole, 541 F.2d 938 (2 Cir. 1976), in which the district court had mandated such disclosure.
 
 
 81
 The district court also faulted the Board because neither the petitioner nor his counsel had an opportunity to see the presentence report before the hearing on December 11th, 1974 and because the examiner panel's report was kept from them and they were not able to see it before it was forwarded to the Regional Director for the Directors' meeting of January 13, 1975. The petitioner through his counsel is demanding a kind of discovery and disclosure in advance of any consideration by the Board of his eligibility for parole. This Circuit has held, however, that even after parole is denied such discovery is not "required as part of the minimum due process to be accorded the parole applicant." Haymes v. Regan, 525 F.2d 540, 542 (2 Cir. 1975). But the petitioner who has been denied parole is entitled to a written statement setting forth "both the grounds for decision to deny him parole, and the essential facts from which the Board's inferences have been drawn." Haymes v. Regan, supra, at 544. The petitioner, therefore, has no such constitutional right to the information in the Parole Board's file, including but not limited to the presentence report and the examiner panel's report. It was error for the district court to hold to the contrary.
 
 
 82
 Id. at 945 (Footnote omitted; emphasis added). However, because the definition of minimum due process is often sensitive to what proves necessary in practice to a fair procedure, we examined the issue of disclosure of parole files in yet another case, Holup v. Gates, 544 F.2d 82 (2d Cir. 1976), cert. denied, 45 U.S.L.W. 3634 (U.S.1977). We reiterated there that to decide what procedural protections are due in any proceeding requires a balancing of "the inmate's interest in the proceedings . . . the 'need for and usefulness of the particular safeguard in the given circumstances . . .' (and) any direct burden which might be imposed on the Board." 544 F.2d at 85-86, quoting Haymes v. Regan, 525 F.2d at 543. Faced in Holup with a blank record because of a dismissal below on the pleadings, we remanded for the determination of "sufficient hard evidence . . . upon which to base a judgment," including the particular circumstances of the parole decision of the one surviving appellant, Arthur DeLorenzo, and more systematic information on the frequency of mistakes in Connecticut parole files and whether they often are on matters material to the parole decision, how onerous would be the administrative burden of redacting parole files to exclude the sources of information given in confidence and to exclude altogether information which would threaten prison discipline, and whether the burden would be significantly reduced by giving access to parole file information only to those inmates who had already been denied parole, with a prompt second hearing after such inspection. We do not wish to prejudge the issues left for examination in the Holup remand, and observe only that the 5850 parole applications processed each year in New York State, see United States ex rel. Johnson v. Chairman, New York State Board of Parole, 500 F.2d at 928, suggests the burden of redacting files for all parole applicants can be a considerable one. Generally, a Haymes statement of reasons and facts will suffice to tell whether the parole board has relied on an impermissible reason or a reason for which there is no support in the record; what an inmate might find most often upon inspection of institutional files is that there is "some evidence" to support the board's reasons for denial, but evidence which he believes is outweighed by other facts. One hesitates, to echo Mr. Justice White, to place the federal courts fully astride the discretionary decisions of state parole boards which require weighing conflicting evidence on a
 
 
 83
 prisoner's attitude toward law and the community, his mental and physical state, his emotional stability, his sense of responsibility, parole plans, family status, skills, prospective employment, prospective residence, use of narcotics, prior criminal record, and his conduct in prison.
 
 
 84
 500 F.2d at 930. However, there may in the future be circumstances where an inmate plausibly contends that the only way he can demonstrate reliance on an impermissible factor or can show a particular allegation concerning his record to be false, cf. Meachum v. Fano, 427 U.S. at 229, n. 8, 96 S.Ct. 2532, is by obtaining access to the detailed evidence in his file, albeit in redacted form.
 
 
 85
 We are not required to express an opinion how such a case should be decided, since we do not have that situation here. There is no showing that Williams suffered any prejudice from the lack of access to his files. Williams' complaint in the action, filed August 6, 1975, itself demonstrates that he knew prior to the September parole hearing that his mental health had been placed in issue by at least some materials in his institutional files.[8] Although he may have preferred more detailed and exact information as to the content of the diagnoses, even with such access the only way he could effectively have countered such diagnostic opinions was to provide evidence from an expert of his own, a course which would seem entirely feasible even without access to the competing diagnosis but which he did not choose to follow.[9]
 
 
 86
 There is likewise no indication that the Parole Board relied dispositively on Williams' psychiatric diagnosis in denying parole, although admittedly state law requires that psychiatric information on the inmate be before the Parole Board, New York Correction Law §§ 211, 214(2)-(4); 7 N.Y.C.R.R. § 1910.15(b); 9 N.Y.C.R.R. §§ 1.5, 1.9. The first and third reasons given in the September 11, 1975 statement of reasons were "The violent and vicious nature of the crimes" and that "There is no indication that you have utilized available programs to prepare yourself for parole release at this time." Williams admitted at the parole hearing that he had not participated in AA, any high school equivalency program, or college courses despite his professed desire to work as a para-legal, evidence which alone seems sufficient to support the third reason. Even the second stated reason, that "institutional reports indicate that you may benefit from the treatment which is available to you at this institution" seems a conclusion plausible on its face where an individual has previously committed a violent crime but engaged in no counselling or therapy programs since then.[10]
 
 
 87
 Before concluding, we should state briefly why the district court's reliance on Velger v. Cawley, 525 F.2d 334 (2 Cir. 1975), reversed on other grounds sub nom. Codd v. Velger, 429 U.S. 624, 97 S.Ct. 882, 54 L.Ed.2d 92 (1977), and Cardaropoli v. Norton, 523 F.2d 990 (2 Cir. 1975), to support a right of discovery of parole files was misplaced. Velger held that a probationary policeman who was discharged for a supposed suicide attempt had a due process right to a hearing to contest the allegation because of the stigma and loss of future employment opportunities resulting from the allegation. In Velger the information contained in the personnel files was made freely available to prospective public employers and, with "permission" from the policeman, to private employers. Had the information been restricted for use in internal decision-making, i. e., deciding whether to discharge the probationary policeman, we held that no such hearing was required.[11] There is as well a fundamental difference in the circumstances in which such a right of hearing would be implemented; providing an adversarial hearing to policemen will hardly create security problems, and we doubt whether the discharge of probationary policemen is likely to occur in such annual number as do adverse parole release determinations. Nor did we even squarely hold in Velger that the policeman had a right to full presentation of the evidence on which the police department would rely; we prescribed an adversarial proceeding but did not mandate that all adverse witnesses be presented.
 
 
 88
 Cardaropoli also does not mandate a right of discovery on the facts here. There we held that when an inmate is to be designated a Special Offender, he must be given written notice specifying the reasons for the proposed designation, a brief description of the evidence to be relied on, and a personal appearance before a disinterested decisionmaker. At that hearing he will be permitted to call witnesses and present evidence, although the hearing officer retains discretion to refuse to call witnesses where a security problem would be created.
 
 
 89
 And the inmate's opportunity for confrontation and cross-examination, available only when the decisionmaker cannot otherwise rationally determine the facts, is not without restraints. Such an opportunity, while of paramount importance in many settings, is unnecessary in the overwhelming majority of Special Offender classification proceedings where "the source of the information against the prisoner is contained in his presentence report or in other documentary materials." . . . Although the risk of prison disruption is minimal because most witnesses confronted would not be fellow inmates, compare Wolff v. McDonnell, supra, 418 U.S. at 568-69, 94 S.Ct. 2963, we do not believe that the balance of interests is upset by this limitation and its exception.
 
 
 90
 523 F.2d at 998 (emphasis added). The loss inflicted by the Special Offender designation was undisputed. The government admitted that the designation had resulted in rejection of Cardaropoli's application for furlough and the designation generally hindered eligibility for rehabilitative programs and the granting of parole; the designation meant that all applications for transfer or work release had to be cleared through the Central Office of the Bureau of Prisons, often leading to inordinate delay, and that parole applications would be considered, at the initiative of a Regional Director of the United States Parole Board, in special en banc review by the five Regional Directors. In addition, the allegations underlying the Special Offender designation were more susceptible to disproof than the predictive judgments made by a parole board (Cardaropoli was alleged to have owned a certain lounge and attended a certain meeting), and the number of designations which might be disputed was very small (only 500 federal inmates nationally were considered Special Offenders in 1974), compared to the number of parole release decisions. See 523 F.2d at 999 & n. 20.
 
 
 91
 (13) The district court was therefore in error in granting summary judgment to Williams to the extent that it did and we reverse its order. Since there is no suggestion that Williams has any further facts to offer, we direct that the complaint be dismissed.
 
 HAYS, Circuit Judge (dissenting):
 
 92
 I dissent.
 
 
 93
 The opinion of the court correctly holds that neither Preiser v. Rodriguez, supra, nor principles of res judicata require that this action be dismissed.[1] Furthermore, the court recognizes that although the Supreme Court has not yet decided whether due process safeguards apply to parole release hearings, in this circuit it is well settled that parole applicants enjoy at least some due process rights. See, e. g., Haymes v. Regan, supra; United States ex rel. Johnson v. Chairman, New York State Board of Parole, supra; Billiteri v. United States Board of Parole, supra, 541 F.2d at 945. My difference with the court, therefore, is narrow. I would hold that Williams is entitled to due process protections and that, more specifically, the district court's order properly reflects the respective interests of Williams and the state in arriving at the calculus for how much process is due in this case.
 
 
 94
 The question presented for our decision, essentially, is whether Williams had the right to discover certain information in his institutional files. Certainly, it cannot be gainsaid that a parole board has the right, indeed the obligation, to consider an inmate's mental condition in deciding whether or not a release on parole is appropriate. See, e. g., New York Correction Law §§ 211, 214(2)-(4); 7 N.Y.C.R.R. § 1910.15(b); 9 N.Y.C.R.R. §§ 1.5, 1.9. Williams, recognizing this to be so, does not claim that he is entitled to have deleted from his files all adverse information; rather, he seeks only discovery of that information and an opportunity to rebut it at a new release hearing.
 
 
 95
 Of course, the success of Williams' claim depends on whether the failure to grant such relief would constitute a deprivation of "liberty" within the meaning of the due process clause. As I read this court's decisions on the due process rights of parole candidates, the constitution mandates that Williams be afforded the relief requested.
 
 
 96
 The court today admits that "there may . . . be circumstances where an inmate plausibly contends that the only way he can demonstrate reliance on an impermissible factor or can show a particular allegation concerning his record to be false . . ., is by obtaining access to the detailed evidence in his file, albeit in redacted form." See United States ex rel. Johnson v. Chairman, New York State Board of Parole, supra, 500 F.2d at 934. The court denies, however, that Williams is such an inmate, holding that "(t)here is no showing that Williams suffered any prejudice from the lack of access to his files." I disagree.
 
 
 97
 Throughout the proceedings below, both in his complaint and in his motion for summary judgment, Williams asserted a very real prejudice in having been denied access to his files. Specifically, he claimed, and continues to claim, that the information characterizing him as "mentally disturbed" is false, and that he has been denied social furloughs, work release, and parole because of the inclusion of that information in his files. At no stage in this proceeding has the state disputed Williams' allegation that he has suffered these deprivations because his files contain the adverse information here at issue. Under these circumstances, I cannot understand the court's finding that there is "no indication that the Parole Board relied dispositively on Williams' psychiatric diagnosis in denying parole. . . ." The state's failure to deny Williams' allegations is for me tantamount to an admission that those allegations are true; that failure cannot be explained away with the observation that "defendants' procedural pose in this case was at times somewhat inept." Note 10, supra.
 
 
 98
 It is true that "(w)here the evidentiary matter in support of (a) motion (for summary judgment) does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." Adickes v. S. H. Kress & Co., 398 U.S. 144, 160, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970), quoting from Advisory Committee Note on 1963 Amendment to subdivision (e) of Fed.R.Civ.P. 56. However, in Donnelly v. Guion, 467 F.2d 290, 293 (2d Cir. 1972), we interpreted the 1963 amendment to Rule 56 as expressing
 
 
 99
 "the standard always applied in this Circuit that '(w)hen a party presents evidence on which, taken by itself, it would be entitled to a directed verdict . . . it rests upon (the opposing) party at least to specify some opposing evidence which it can adduce and which will change the result.' Radio City Music Hall Corp. v. United States, 135 F.2d 715, 718 (2d Cir. 1943)."
 
 
 100
 Thus, in Donnelly we affirmed the district court's grant of summary judgment despite the opposing party's denial of the movant's allegations, holding that
 
 
 101
 "(a) party opposing a motion for summary judgment simply cannot make a secret of his evidence until the trial, for in doing so he risks the possibility that there will be no trial. A summary judgment motion is intended to 'smoke out' the facts so that the judge can decide if anything remains to be tried."
 
 
 102
 Id. (footnote omitted). See also Economou v. United States Department of Agriculture, 535 F.2d 688, 696 (2d Cir. 1976); Hahn v. Sargent, 523 F.2d 461, 467 (1st Cir. 1975); Applegate v. Top Associates, Inc., 425 F.2d 92, 96 (2d Cir. 1970).
 
 
 103
 On the record in this case, I think it clear that Williams has presented evidence which, taken by itself, would entitle him to a directed verdict. If the state knew of facts which indicated that there remained genuine issues to be tried, it had the obligation to come forward with those facts or risk summary judgment. On the evidence before him Judge Knapp properly decided that nothing remained to be tried.[2]
 
 
 104
 Once the facts are viewed in this light, our decision in Cardaropoli v. Norton, supra, takes on added significance. In that case we held that classification of a federal prisoner as a "special offender" created a "grievous loss", Morrissey v. Brewer, supra, 408 U.S. at 481, 92 S.Ct. 2593, inasmuch as that designation hindered eligibility for "social furloughs, work release, transfer to Community Treatment Centers, and the opportunity for early parole . . . ." 523 F.2d at 994. We therefore ruled that that label might not be imposed without affording the inmate written notice of the contemplated classification, the reasons therefor, and the evidence to be relied upon, and a personal appearance before an impartial decision-maker. Id. at 996.
 
 
 105
 In this case, although Williams has not been officially designated as "mentally disturbed," on the above facts he has in a very real sense been specially classified and, as a result, has suffered a "grievous loss" of the type referred to in Morrissey v. Brewer. It follows that he must be afforded "basic elements of rudimentary due process." Cardaropoli v. Norton, supra, 523 F.2d at 995. See also Shelton v. Taylor, 550 F.2d 98, 102 (2d Cir. 1977); Zurak v. Regan, 550 F.2d 86, 92-93 (2d Cir. 1977); Childs v. United States Board of Parole, 167 U.S.App.D.C. 268, 511 F.2d 1270, 1278 (1974).[3]
 
 
 106
 I do not read our decision in Holup v. Gates, supra, to mandate a contrary conclusion. In Holup, we remanded, "with some reluctance," 544 F.2d at 87, because it was unclear from the record whether the alleged inaccuracies in plaintiffs' parole files were material to the parole decision. In this case, however, there is undisputed evidence that the adverse information in Williams' file did contribute to the denial of parole. Furthermore, defendants have not claimed, as did the Connecticut Board of Parole in Holup, that the burden imposed by the district court's order would be unduly onerous.[4]
 
 
 107
 Moreover, I find Billiteri v. United States Board of Parole, 541 F.2d 938 (2d Cir. 1976), cited by appellants for the proposition that there is no due process right to discover one's pre-sentence report, distinguishable from the instant case. In Billiteri, the relevant statute provided for no access to the pre-sentence report. Compare New York Criminal Procedure Law § 390.50(2) (McKinney 1975) (making generally available to the defendant or his attorney the pre-sentence report or memorandum). Furthermore, Billiteri and his counsel had received a copy of the report in the district court and had "had full opportunity . . . to rebut any or all of the statements contained therein and to point out to the court any particular prejudice suffered . . . but they made no attempt to do so." 541 F.2d at 945.
 
 
 108
 More significantly, it has long been settled doctrine that the requirements of procedural due process vary according to the particular facts of each case. Morrissey v. Brewer, supra, 408 U.S. at 481, 92 S.Ct. 2593; Goldberg v. Kelley, 397 U.S. 254, 262-63, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).[5] Thus, in balancing Williams' interest in an accurate parole file against the state's interest in an orderly system of prison administration, see Holup v. Gates, supra, 544 F.2d at 85-86; Haymes v. Regan, supra, 525 F.2d at 542-43; Cardaropoli v. Norton, supra, 523 F.2d at 995; see generally Friendly, Some Kind of Hearing, 123 U.Pa.L.Rev. 1267, 1278 (1975),[6] the court must apply a standard which is, in a sense, unique to this case.
 
 
 109
 The private interest here affected is clearly of the utmost importance. The inclusion in Williams' file of the information characterizing him as mentally disturbed works a "serious alteration in the inmate's conditions of confinement," Cardaropoli v. Norton, supra, 523 F.2d at 995, and makes imperative the need for an accurate file.[7]
 
 
 110
 Against this defendants assert rather vaguely that some of the information in Williams' file, such as his presentence probation report, is confidential. Although it is not clear that the file does in fact contain confidential material, see, e. g., New York Criminal Procedure Law § 390.50(2) (McKinney 1975), I would agree with the district court that, in any event, "the seeming dilemma posed (by defendants' confidentiality claim) is more imaginary than real. Defendants can provide plaintiff with a summary of the materials involved and the conclusions stated therein while at the same time maintaining the confidentiality of any sources upon which the conclusions may be based." Williams v. Ward, 416 F.Supp. 1123 at 1125 (S.D.N.Y.1976).
 
 
 111
 Finally, there is one particularly troubling aspect of the court's opinion. At no time during the proceedings below or in its arguments before this court has the state so much as mentioned the possible administrative burden of allowing Williams to inspect his parole file. Nevertheless, the court rests today's decision in large part on the observation that "the burden of redacting files for all parole applicants can be a considerable one. . . . One hesitates . . . to place the federal courts fully astride the discretionary decisions of state parole boards . . . ." Supra at 1160 (emphasis added).[8] This is both unsound and unfair.
 
 
 112
 By not so subtly raising the specter of the impossible administrative burden that would be occasioned by granting parole applicants broad rights to inspect their files, the court belies its earlier recognition of the principle that the quantum of process due varies depending upon the precise facts of each case. I favor no per se extension of discovery rights to parole candidates, and do not read the opinion below to suggest one. I would only hold that on the record before us, due process requires that Williams be granted access to his files and a new release hearing.
 
 
 113
 If the court nevertheless feels that the issue of administrative burden is relevant here, I would think that as a matter of fairness we should remand this case to the district court, as we did in Holup v. Gates, supra, for a determination of what that burden is likely to be. By failing to do so the court rests its decision at least partly on observations not supported by the record before us.
 
 
 114
 The court seeks to justify its decision to dismiss the complaint rather than remand with the comment that "there is no suggestion that Williams has any further facts to offer . . . ." Supra at 1162. This is disingenuous. Williams, understandably, had no reason to suspect that there were any additional relevant facts involved here. He should, at the very least, be given an opportunity to rebut the claim of undue burden.
 
 
 115
 For the foregoing reasons, I respectfully dissent.
 
 
 
 [1]
 I hope by now, that you received my previous letter, advising you of the professional misconduct charges filed against you with the Committee on Judiciary of New York State and Chairman of New York State Judicial Conference
 Since you have willing disregarded my constitutional rights not only during the course of the proceedings leading to the convictions, but, during post-conviction action before this court.
 Not only did you violated my constitutional safeguards but, my co-defendant as well during the course of the criminal proceedings.
 If you decide to entertain my new coram nobis application now pending before the court for consideration, I advise you to grant the same, if you know what I mean.
 Furthermore, I am considering filing charges against you with the New York State Congress for your removal from office on various charges amounting to misconduct in office of a judiciary officer, appointed by the State governor's office.
 So I am going to inflict great public punishment upon you for violating my constitutional rights and exercising bad justice and disregarding the oath of office.
 I would advise you to retain counsel to defend you on these charges.
 
 
 [2]
 On the initial denial form, the "approved" box was inadvertently checked, but the release committee's intention to deny the application was indicated by their detailing of the reason for denial ("too much time to Bd. for placement"); Williams was subsequently advised in writing that the "approved" box had been mistakenly checked
 
 
 [3]
 The Preiser Court reserved the question whether habeas might also be available to attack prison conditions, Preiser v. Rodriguez, 411 U.S. at 482, 499, 93 S.Ct. 1827
 
 
 [4]
 See Coogan v. Cincinnati Bar Ass'n, 431 F.2d 1209, 1211 (6 Cir. 1970); Jenson v. Olson, 353 F.2d 825 (8 Cir. 1965); Rhodes v. Meyer, 334 F.2d 709, 716 (8 Cir.), cert. denied, 379 U.S. 915, 85 S.Ct. 263, 13 L.Ed.2d 186 (1964); Goss v. Illinois, 312 F.2d 257 (7 Cir. 1963). The Supreme Court itself refrained from directly ruling on the point, see 411 U.S. at 509 n. 14, 93 S.Ct. 1827 (dissenting opinion), Ellis v. Dyson, 421 U.S. 426, 440-41 n. 6, 95 S.Ct. 1691, 44 L.Ed.2d 274 (1975) (dissenting opinion), but used the result of those cases as the premise of its argument that where § 1983 is an available federal remedy, there is great incentive for a state prisoner to proceed immediately in § 1983 rather than first seeking state remedies lest that federal remedy be precluded under res judicata by the outcome of the state court proceeding, and therefore that the provision of § 1983 for restoration of good-conduct-time credits would be all the more disruptive of federal-state comity. See also Lackawanna Police Benevolent Ass'n v. Balen, 446 F.2d 52 (2 Cir. 1971) (per curiam), and cases cited in Mastracchio v. Ricci, 498 F.2d 1257 (1 Cir. 1974), cert. denied, 420 U.S. 909, 95 S.Ct. 828, 42 L.Ed.2d 838 (1975)
 
 
 [5]
 In contrast to Halpern, see Kessler v. Armstrong Cork Co., 158 F. 744, 747-48 (2 Cir. 1907), cert. denied, 207 U.S. 597-98, 28 S.Ct. 262, 52 L.Ed. 357 (1908)
 
 
 [6]
 Though the criteria are phrased in § 213 and § 214(4) as necessary rather than sufficient conditions,
 Discretionary release on parole shall not be granted merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the board of parole is of opinion that there is reasonable probability that, if such prisoner is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society. . . . (§ 213).
 No prisoner shall be released on parole unless the board is satisfied that he will be suitably employed in self-sustaining employment if so released. (§ 214(4), last sentence).
 we do not find that difference dispositive. Sections 213 and 214(4) still stand in marked contrast to § 23(1), which specifies no criteria whatsoever to govern the transfer of inmates among correctional facilities.
 
 
 [7]
 That such statements of reasons and facts are adequate to protect an inmate's lesser due process interest in "conditional release" (release from "definite" sentences, that is, sentences under New York law of one year or less and aggregating no more than two years) was affirmed in Zurak v. Regan, 550 F.2d 86 (2 Cir.), cert. pending, No. 76-1564, 45 U.S.L.W. 3755 (U.S. May 9, 1977). We held there that due process did not require a personal hearing before the Parole Board for such short-term inmates, for
 Appellees do not claim that there is any motive for, or evidence of, fabrication in the parole officers' relation (to the Parole Board) of the inmate interviews. . . . Thus, the risk of the Board basing its decision on erroneous information is relatively minimal and the record simply does not support allegations that misinformed decisions have been prevalent in the past. Compare Holup v. Gates, supra, (2 Cir.), 544 F.2d (82) at 86. The requirement of a statement of reasons and facts should serve to protect the inmate from arbitrary decisions, or those based on impermissible grounds, see Haymes v. Regan, supra, 525 F.2d at 544; United States ex rel. Johnson v. Chairman, New York State Board of Parole, supra, 500 F.2d at 929; further, if a decision has no basis in an inmate's file, judicial review should be available. Holup v. Gates, supra, 544 F.2d at 86.
 550 F.2d at 95-96.
 
 
 [8]
 His complaint shows acquaintance with the letters written by Probation Officer Fastov and Justice Cone and with his 1973 psychiatric diagnosis as a passive-aggressive personality
 
 
 [9]
 In his interview with the Parole Board, Williams was asked (Appendix at 36a) whether he had participated in any counselling or psychotherapy program "to find out of there is any problem that you have within that there is any problem that can be supported, recognized, and worked with through the psychiatrist or psychologist in the institutions." Williams replied that the Napanoch psychiatrist had indicated "there was no need for therapy or anything of this nature" and that he felt no need of therapy on his own part. He was subsequently given the opportunity to "make any statement that you feel is important to you that we have not discussed that you would like to have us consider here today", but discussed his accomplishments as a jail house lawyer and his work with various prison reform groups rather than the Fastov and Justice Cone letters concerning his mental health
 
 
 [10]
 The reasons given by the Napanoch Temporary Release Committee in support of the decision to deny Williams participation in the temporary release programs are similarly independent of Williams' psychiatric status ("Assaultive nature of present offenses," "lack of meaningful work and educational program," and length of time remaining until parole reconsideration). The district court argued that "plaintiff has alleged and defendants nowhere dispute that he has been denied social furloughs, participation in work-release and release on parole as a direct result of the inclusion in his file of the adverse information here involved." (July 23, 1976 opinion, at 2). While defendants' procedural pose in this case was at times somewhat inept (their Rule 9(g) statement listed only the facts as to which there was no triable issue, rather than the facts as to which there was dispute), we do not take their answering papers as admitting Williams' allegation. Indeed, we do not think that, even unopposed, Williams' moving papers would support the motion for summary judgment, since the official reasons recited therein for the denial of his parole and temporary release applications contradict Williams' assertion that the denials were caused by the adverse psychiatric information. See 6 J. Moore, Federal Practice P 56.15(3), at 56-476-77 & n. 16 (2d ed. 1976)
 
 
 [11]
 We . . . hold that the findings of the trial court that no proof of stigma was made are clearly erroneous. (But this) result need not have any material impact upon the practice of not affording a hearing to probationary dischargees. The appellees could change their disclosure procedures to prevent the dissemination of derogatory and possibly stigmatizing allegations unless notice of the charges and a hearing are first afforded to the dischargee
 525 F.2d at 337.
 
 
 [1]
 Despite the statement in Part III of the opinion that "(i)t can be strongly argued that this claim is precluded by Judge Judd's finding," supra at 1155, the court takes pains to rest its decision "on the merits rather than on the ground of res judicata." Supra at 1155. Since the res judicata discussion is therefore not dispositive of this appeal, I will but briefly note my disagreement with the court's suggestion that issue preclusion should operate here
 Although Williams was indeed "pursuing two actions simultaneously," supra at 1154, it does not follow that he could therefore "fully anticipate the potential barring effect of the earlier judgment in deciding not to appeal from Judge Judd's determination." Id. The court recognizes that the identity of the two claims is by no means clear; under these circumstances I would not penalize a plaintiff for failing to appeal from one decision by holding that collateral estoppel bars consideration of an arguably different claim presented in a second action. Moreover, insofar as Judge Judd's decision rested on a finding that Williams had failed to exhaust his state remedies, its collateral estoppel effect is even less clear. See Restatement of Judgments Second § 48.1 comment e, at 49 (Tentative Draft No. 1, March 28, 1973); Developments in the Law Res Judicata, 65 Harv.L.Rev. 818, 845 (1952). I would therefore hold that the Caldwell decision has no res judicata effect in this action.
 
 
 [2]
 Nor do I agree that Williams was already equipped to counter the adverse information without gaining access to his files. Williams knew only that at least two letters regarding his mental capacity were included, note 8, supra ; without inspection of the file, he would have no way of effectively rebutting the information contained therein
 
 
 [3]
 The court's reliance on Zurak v. Regan, 550 F.2d 86 (2d Cir. 1977), note 7, supra, is misplaced. The record before us, unlike that in Zurak, clearly supports plaintiff's allegations that he has been denied parole on the basis of "erroneous information," id. at 86, and that a statement of reasons is inadequate to protect him from a decision by the parole board "based on impermissible grounds." Haymes v. Regan, supra, 525 F.2d at 544
 
 
 [4]
 In any event, Holup was before us "in an unusual posture." 544 F.2d at 85. The only plaintiff who remained from the three that had originally brought the action had not had a hearing and, therefore, because he had no record to present for review, was forced to argue "that as a matter of constitutional law, any parole procedure which fails to allow every prospective parolee an inspection of his file in advance of his hearing, whether requested or not, is a violation of the Fourteenth Amendment by the State involved." Id. (footnote omitted) Understandably, the court was unwilling to reach so broad a proposition where a remand could refine the issues under consideration and produce a more complete record for review
 
 
 [5]
 The court reaffirms this principle today with its observation that "the definition of minimum due process is often sensitive to what proves necessary in practice to a fair procedure. . . ." (emphasis in original)
 
 
 [6]
 "The required degree of procedural safeguards varies directly with the importance of the private interest affected and the need for and usefulness of the particular safeguard in the given circumstances and inversely with the burden and any other adverse consequences of affording it."
 
 
 [7]
 Indeed, Williams' interest is arguably greater than was Billiteri's; while Billiteri suffered only the denial of parole, Williams has, in addition, been denied participation in statutorily authorized temporary release programs
 
 
 [8]
 The court repeats this concern in seeking to distinguish Cardaropoli v. Norton, supra, from the instant appeal on the ground that "the number of (Special Offender) designations which might be disputed (is) very small . . . compared to the number of parole release decisions." Supra at ----